[Cite as *In re J.B.*, 2013-Ohio-1704.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 98546**

## IN RE:  J.B.
## Minor Child

[Appeal by Mother, S.B.]

**JUDGMENT:**
AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD 09901436

**BEFORE:**  McCormack, J., Jones, P.J., and S. Gallagher, J.

**RELEASED AND JOURNALIZED:**  April 26, 2013

**ATTORNEY FOR APPELLANT**

Joseph V. Pagano
P.O. Box 16869
Rocky River, OH    44116


**ATTORNEYS FOR APPELLEE, C.C.D.C.F.S.**

Timothy J. McGinty
Cuyahoga County Prosecutor

BY: Michelle A. Myers
Assistant Prosecuting Attorney
C.C.D.C.F.S.
4261 Fulton Parkway
Cleveland, OH 44144

**Also listed:**

**Guardian ad Litem**

Michael B. Granito
24400 Highland Road
Suite 162
Richmond Heights, OH    44143

TIM McCORMACK, J.:

{¶1} Appellant, S.B. ("appellant"), appeals the judgment of the Cuyahoga County Court of Common Pleas, Juvenile Division, that granted permanent custody of the minor child, J.B., to the Cuyahoga County Department of Children and Family Services ("CCDCFS" or "the agency"). For the reasons stated herein, we affirm the judgment of the trial court.

{¶2} As mandated by the statute, the pertinent analysis in a permanent custody matter is the best interest of the child. After a careful review of the record, we find that clear and convincing evidence supports the trial court's determination that granting permanent custody to the agency is in the best interest of J.B. Therefore, we affirm its decision.

## Background

{¶3} In late 2008, Angelique's ("Grandmother Angelique" or "Angelique") two minor daughters gave birth several weeks apart. On October 9, 2008, 13-year-old appellant in this case, gave birth to a daughter. Weeks later, on November 4, 2008, 15-year-old R.B. also gave birth to a girl. CCDCFS had, prior to the births of the babies, previously been involved with the family in March 2008 because of appellant's delinquent conduct. Appellant's age of 13 invoked the jurisdiction of the agency.

**{¶4}** A few months after the births of the babies, a dangerous incident occurred on January 29, 2009, which caused the removal of both babies from the home. The incident occurred in another individual's residence, where appellant, R.B., and two men were present. One of the men was the alleged father of appellant's child. After appellant got into an argument with one of the men, she showed a knife, and caused his finger to be cut. One of the men reportedly pulled a gun. During the incident, appellant's baby was sleeping in another room in a crib. The crib had no mattress. When a social worker went to the house, she found the residence to be in deplorable condition, with graffiti on the wall and windows broken, and it was infested with rats and roaches.

**{¶5}** Four days later, on February 2, 2009, CCDCFS took emergency custody of both babies; R.B.'s baby was less than three months old, and appellant's baby was less than four months old.

**{¶6}** Seven months later, in August 2009, both babies were placed into a foster home. Both babies have remained in that same foster home.

**{¶7}** This appeal concerns appellant's child, J.B., only. R.B.'s child, who has the same initials as J.B., is the subject of a companion case, *In Re J.B.*, 8th Dist. No. 98565.

## Procedural History

{¶8}   On July 30, 2009, six months after J.B.'s removal from appellant, the trial court adjudicated J.B. as neglected and dependent and, on the same day, committed her to the temporary custody of CCDCFS.   On May 21, 2010, CCDCFS was granted the first extension of temporary custody; on August 28, 2010, a second extension was granted.

{¶9}   On January 28, 2011, 18 months after being granted J.B.'s temporary custody, CCDCFS filed a motion to modify temporary custody.   The agency sought permanent custody.   Subsequently, both appellant and her mother, Angelique, filed a motion for legal custody.   In addition, the guardian ad litem (GAL) for J.B. filed a motion for legal custody to be granted to Sanetta ("Great-grandmother Sanetta" or "Sanetta"), who is J.B.'s maternal great-grandmother and Angelique's mother.

## The Trial for Permanent Custody

{¶10} The trial for permanent custody took place on November 17, 2011, January 24, 2012, and March 21, 2012.   CCDCFS presented the testimony of Officer Omar Maxel; two social workers in this case, Sarah Narine and Justin Fraley; and the foster mother.

{¶11} Appellant presented the testimony of Tamela Rowe (a Murtis Taylor case worker), Krsanandini Devi-Dasi (co-director of Dasi-Ziyad Family Institute), Vanessa Davis (a teacher in Beech Brook), and appellant's cousin B.W.

{¶12} Grandmother Angelique, Great-grandmother Sanetta, and appellant herself testified as well.

## A. Officer Maxel's Testimony

{¶13} At trial, Officer Maxel testified about an incident appellant was involved in a month before the first day of the trial. On October 7, 2011, he responded to a call about fighting in a shopping center. Appellant had gone to a store with her three-year-old stepsister, whom she was babysitting. The officer learned from the store employees and three victims that appellant instigated a fight with one of the victims, a 12-year-old, in the parking lot. During the incident, appellant left the three-year-old unattended in the store.

{¶14} When Officer Maxel and his partner arrested appellant for the incident and attempted to put her in the backseat of the police cruiser, she began to yell and scream, and fought with them. Officer Maxel testified that it took three officers to place appellant in the backseat. When the three victims stood outside the cruiser to identify her, she became angry and started to kick at the bars on the cruiser's windows, all the while screaming and yelling. In the police station, as soon as she was uncuffed, appellant began to fight with the officers again. It took four officers to subdue her. She was charged in juvenile court with endangering children, for leaving the three-year-old child unattended; criminal damaging, for throwing a rock through one of the victims' car window; resisting arrest, for fighting with the officers; and assault, for hurting the 12-year-old girl during the fight. Officer Maxel testified that during the time when appellant was in custody, she did not inquire as to the welfare of the three-year-old.

## B. Two Social Workers' Testimony

{¶15} Social worker Sarah Narine testified that she began working with appellant in March 2008 to address her delinquent behaviors. This was seven months before she gave birth to J.B. After appellant gave birth in October of that year, Narine then worked with her on her parenting skills. Appellant named a father, but subsequent genetic testing showed the individual was not the father.

{¶16} Narine testified that a month after the baby's birth, appellant got into an argument over some candy with her father, with whom she lived at the time. She left the house, leaving the baby unattended.

{¶17} Subsequently, an incident occurred on January 29, 2009, which caused the removal of J.B. from appellant's care. In this incident, she was involved in a fight with the alleged father of J.B. and the man's brother, in a house known as a "flop" house. During the incident, J.B. was sleeping in a mattress-less crib in another room in the house.

{¶18} This incident, coupled with the agency's concerns about appellant's inability to care for J.B. and appellant's family's inability to control her behaviors, caused the agency to remove J.B.

{¶19} A case plan to achieve reunification was put in place the next month. The reunification plan included counseling to address appellant's anger management, emotional stability, schooling, and parenting skills.

{¶20} Narine testified that before J.B. was born, appellant did not attend school regularly. She would run away from home for up to a week at a time. After giving

birth to J.B., she stopped attending school.   She was subsequently enrolled in three different schools for young parents.   She did not complete any of the schooling.

{¶21} The agency referred appellant to several programs to help with her parenting skills and to provide her with a crib and other baby supplies.   One of the programs, Community Collaborative, tried to stay involved in appellant's case.   They tried to engage appellant and her mother, Angelique.   Appellant and her mother  were not responsive to their offer to help.

{¶22} Appellant was also referred to "MST" in-home counseling services by the juvenile court when she was involved in a delinquency case.   The counseling was to address her emotional stability, domestic violence, fighting, and aggression issues. Because appellant went back and forth between her mother's and her father's residences, the counselor was not always able to locate her.   As a result, Applewood, the agency responsible for providing the counseling services,  changed it to on-site services. However, Applewood had a difficult time engaging appellant.   According to Narine, Grandmother Angelique encouraged appellant not to attend the counseling appointments.  Grandmother Angelique claimed appellant did not need counseling. CCDCFS then referred appellant to Bellflower, which provides mentoring services.   Appellant was discharged from the program due to her angry outbursts.   Appellant was then enrolled in a program at Murtis Taylor, a local community center.   Her attendance there was not consistent either.   Appellant's mother, Angelique, on her own, found a two-month

program at the Dasi-Ziyad Family Institute and enrolled appellant, but it took appellant six months to complete the program.

**{¶23}** CCDCFS helped appellant's enrollment in an additional parenting program at Beech Brook, another local community and counseling center. Appellant attended the program sporadically. Narine felt appellant's mother, Angelique, did not help appellant implement the techniques she was taught there.

**{¶24}** Narine testified that the objectives set forth in appellant's case plan had not been met.

**{¶25}** Regarding visitations, they were held weekly at the agency for two hours each. Appellant's family members were included in these visits.

**{¶26}** Beginning in June 2010, appellant was making some progress. She attended school and most of her appointments. As a result, CCDCFS started in-home overnight visits. However, the agency terminated them after appellant's mother, Angelique, informed the agency that appellant stopped attending school and counseling services. Appellant was not staying in the home or following rules. When Narine asked Angelique if she herself was able to provide for J.B. during J.B.'s in-home visits, Angelique told her "it was overwhelming for her. She had other children in the home to care for. She had other things to do for herself." As a result, the visits went back to the agency to be held.

**{¶27}** Several months later, in August 2010, appellant indicated to Narine that she was "willing to be committed" to J.B. Other family members also came forward to offer

to help appellant. As a result, CCDCFS started overnight in-home visits again. These in-home visits ended at the end of the year, when the agency learned appellant again showed poor decision-making and parental skills. One night, J.B. was not asleep, so appellant took her outside at 2:00 a.m. and put her on the hood of the car. There was no adult supervision when the incident occurred. Appellant would also leave home with J.B. without a coat for J.B.

{¶28} Regarding appellant's behavior, Angelique told the social worker that "it was going to be very difficult, but there was nothing they could do about that. They would have to try to make it work."

{¶29} Narine acknowledged that appellant and J.B. have a close relationship. She had observed appellant show affection toward J.B. during the visits. However, Narine testified that the problems that led to J.B.'s removal from appellant had not been resolved. Appellant was still involved in fighting incidents and still had issues of anger and aggression. Her emotional stability, decision-making, and parenting skills were all causes for concern.

{¶30} The agency considered Grandmother Angelique as a potential relative placement. According to Narine though, Grandmother Angelique indicated to the agency that she has other children and she was not at a point where she could take on another child. She said she was overwhelmed. Grandmother Angelique attended between 20 to 30 percent of the visits. Although none of Grandmother Angelique's own children were removed, Narine testified that there had been ten referrals to the agency due

to reports of Grandmother Angelique's neglect of her own children.   In addition, the agency learned that Grandmother Angelique's boyfriend, who is also the father of Grandmother Angelique's youngest child, had charges against him relating to sex abuse of minors and cruelty towards children.   Separate charges were identified in Cuyahoga County and in Georgia. When asked about it, Grandmother Angelique told the agency she was no longer with her boyfriend.   The agency was unable to verify that information.

**{¶31}** Narine testified that the agency also considered Great-grandmother Sanetta as a potential placement.   The agency found her to be unsuitable.   When the agency investigated her background, it learned she was convicted of gross sexual imposition in 1982 and served five years in prison for the offense.   Narine acknowledged that, in 1992, Great-grandmother Sanetta received the custody of two children of family members from Cuyahoga County Juvenile Court.   In 1997, she received custody of additional children of family members from the juvenile court.   Narine also acknowledged that an in-home visit at Great-grandmother Sanetta's house, in which Narine observed Great-grandmother Sanetta's care, was appropriate.

**{¶32}** CCDCFS was also concerned with Great-grandmother's physical and mental health issues.   She had ongoing medical treatment for a pulmonary disease.   She also received mental health counseling.   Moreover, she only had social security income and was unable to work.

**{¶33}** Seven months after being removed from appellant in January 2009, ten-month-old J.B., together with her cousin, was placed in her current foster home.   She

has remained there since. Narine testified that J.B. is very close to both her foster mother and foster father. When she was ill or agitated, she would seek out their comfort and would respond to their guidance. J.B. had significant medical issues. She had difficulties eating when she was younger. The condition required her to have tongue surgery. As she got older, she also needed to have eustachian tubes put into her ears to deal with drainage problems.

{¶34} Justin Fraley, the second social worker, who was on the case since September 2011, testified that appellant needed directions and help from other family members to attend to J.B.'s needs during the visits. However, she was affectionate with J.B. She would hug and kiss J.B. when J.B. came into the visitation room. She would carry her out and put her in the car seat herself. She would tell J.B. she loved her.

{¶35} Fraley also testified about the October 7, 2011 incident. That incident was where appellant left a younger sibling, who was in her care, alone in the store as she went to the parking lot to engage in a physical fight. The incident resulted in pending delinquency charges against appellant.

{¶36} Fraley stated that appellant went to Murtis Taylor for counseling to address depression and anger issues. Her attendance was sporadic initially but she started to open up to her counselor recently. She had on occasions expressed to Fraley her feelings of being overwhelmed.

{¶37} Fraley testified that appellant had originally resided with her mother Angelique but then moved in with her father, whom she was staying with at the time of

the trial (January 24, 2012). Angelique told Fraley that appellant went to live with appellant's father because Angelique "can't deal with it."

{¶38} Fraley testified that Angelique attributed appellant's behavioral problems to the loss of J.B. Angelique attended most of the visits while he was on the case, and she consistently expressed the wish that J.B. and her cousin should be returned to the family. However, Angelique also told Fraley she was overwhelmed. As to Great-grandmother Sanetta, her attendance was consistent. She appeared to have a genuine interest in J.B. and her cousin.

### C. Foster Parents' Testimony

{¶39} J.B.'s foster mother testified that she and her husband had received extensive training prior to becoming foster parents. She, in fact, works for a foster care agency, and has a good understanding of the different goals for the children placed in the foster homes. When J.B. was placed in her home, the agency goal was a six-month reunification. To facilitate that goal, she worked closely with appellant and her family, and included appellant in many activities beyond the supervised visits. The foster mother stated she and appellant had a very open relationship and they engaged in various activities together.

{¶40} The foster mother testified that J.B. had many medical needs when she first came into their family. She had a tic seizure disorder, and was diagnosed with hydrocephalus initially. In addition, she was not able to eat regular food at ten months due to an enlarged tongue, and a surgery was performed to clip her tongue. She also

required the insertion of tubes in her ears due to frequent ear infections. Because of these health issues, J.B. needed speech therapy. Appellant was required by her case plan to attend these medical appointments. At the beginning, when the foster mother took J.B. to the medical appointments, she would pick up appellant to go with her. However, after the foster mother stopped providing transportation, appellant eventually stopped showing up.

{¶41} Regarding the in-home visits, the foster mother testified that immediately after one home visit, J.B. had a fever. She and her husband took her to the emergency room, where she was diagnosed with hand, foot, and mouth disease. After another home visit, J.B. returned with a severe diaper rash, which required a visit to the emergency room. In addition, according to the foster mother, after every home visit, J.B. would return with diarrhea.

{¶42} During a round of home visits beginning in August 2010, J.B. would come back to the foster family with dirty feet, and was malodorous of diarrhea and cigarette smoke. From November 2010 to January 2011, J.B. would come home with bug bites, which required a visit to the emergency room on two occasions.

{¶43} The foster mother testified that if permanent custody were to be granted to CCDCFS, she wanted to adopt J.B., having signed an Intent to Adopt form. She described J.B. as follows:

[J.B.] is a joy to have in our home. She is a fabulous child. She brings so

much joy. That's the best way I can describe it. She's a happy child. We

interact with her. We do a lot of family activities together. She is enrolled in things in the community, and we love having [J.B.] in our home. She's so inquisitive and we spend a lot of time doing things together, hiking and hay rides. * * * [J.B.] is very bonded to both myself and my husband and to her cousin who is also placed into our home.

**Testimony Presented On Behalf of Appellant**

**{¶44}** Tamela Rowe, a Murtis Taylor case worker, testified for appellant. She testified about the counseling services provided to appellant, and about appellant's improvement in dealing with her tendency to fight with others and her other emotional issues.

**{¶45}** Krsanandini Devi-Dasi, co-director of the Dasi Aiyad Family Institute, also testified for appellant. Appellant was a student in her parenting class at DePaul's Family Center in February 2009. Later, Grandmother Angelique asked Ms. Devi-Dasi to provide additional parenting education to appellant. Grandmother Angelique believed her daughter needed to know more about being a good mother. Appellant completed a 16-hour parenting course in October 2009. Ms. Devi-Dasi described appellant as enthusiastic and interested in parenting skills. She stated appellant could be a good mother; however, she did not have any further contact with appellant since 2009.

**{¶46}** Vanessa Davis, a parent education teacher at Beech Brook, testified that she taught the nine-week Teen Mom Program, which appellant attended and completed. She

stated that appellant participated in role-playing and appeared to retain the information that was taught.

**{¶47}** Appellant's cousin testified that she contacted Sarah Narine to let her know she was interested in having J.B. and J.B.'s cousin placed with her.

### Appellant's Testimony

**{¶48}** Appellant testified on her own behalf. She was in the juvenile detention center when she found out she was pregnant. After she was released from the detention center, she resided with her father. She attended counseling at Applewood pursuant to a court order. She continued the counseling at Murtis Taylor.

**{¶49}** Regarding the October 2011 incident Officer Maxel testified about, appellant stated she was found delinquent of aggravated menacing and disorderly conduct because of her conduct in the incident. She also admitted she was found delinquent in a separate theft matter.

**{¶50}** She testified that she has lived with her mother since February 2012, and planned to stay with her until she could move out on her own.

**{¶51}** As to the diaper rash the foster mother described, appellant stated she was not aware that J.B. had diaper rash. She stated that she had taken J.B. to the doctor on one occasion to examine a rash on J.B.'s body and was told J.B. had been bitten by bedbugs.

**{¶52}** Appellant testified that she was shattered after the agency removed her baby following the January 29, 2009 incident. She stated that J.B. is everything to her and she

has been making an effort to be reunified with her. Appellant stated if J.B. were returned to her care, she will get a job and take education seriously. She said she would want to be a role model for her. She testified that she has a bond with J.B. and J.B. would whisper to her, "Mommy, I want to come home, too."

{¶53} Appellant stated she and the foster mother initially had a good relationship, but the relationship went sour when the foster parents indicated their desire to adopt J.B. and her cousin. Appellant also testified that she read articles on the internet, which suggested that the Children and Family Services employees would receive additional compensation whenever the agency is granted permanent custody. She felt the social workers may have ulterior motives in this case. She did not believe the goal in this case was ever reunification.

## Grandmother Angelique's Testimony

{¶54} Grandmother Angelique testified that she had resided in her current 4-bedroom residence for four years. She has four daughters (age 17, 12, 9, and 4) currently living at home, including appellant. She receives child support and worked odd jobs to support herself and her family. She testified that she could adequately provide for the addition of J.B.

{¶55} Grandmother Angelique denied telling the social workers she was overwhelmed, alleging the social workers on this case lied, "played games" with the family, and were manipulative. She denied having felt overwhelmed and stated that she always had cared for and had control over her children.

**{¶56}** Grandmother Angelique, however, acknowledged the agency first got involved with appellant because of appellant's delinquent behaviors — staying out, not coming home, getting suspended from school, and getting in fights. Grandmother Angelique admitted she could not control appellant's behaviors.

**{¶57}** Grandmother Angelique nonetheless testified that she believed appellant is emotionally stable, but will continue to feel hurt until J.B. is returned to her. Grandmother Angelique stated appellant's healing process would begin only when she knows her baby is safe and she could wake up talking to her baby. Grandmother Angelique also testified that appellant would see scratches on J.B.'s forehead and bruises under her eye in the visits, and she would feel upset and helpless because she couldn't do anything about it.

**{¶58}** Grandmother Angelique stated that appellant was a very good mother and that she was so proud of appellant. When asked about the recent delinquency charges against appellant despite the progress she believed appellant had made, Grandmother Angelique responded that the fact a person was charged did not necessarily mean guilt.

**{¶59}** Grandmother Angelique explained she was not always at the visits because the children's own mothers — her daughters — were there, in addition to her own mother, Sanetta, and also because "it's too much when we get ready to leave and this baby is crying for her mother. It's like she's scared to even go back."

### Great-grandmother Sanetta's Testimony

{¶60} Great-grandmother Sanetta testified that she moved back from Texas after J.B. and her cousin were removed. She contacted CCDCFS to express her interest in taking custody of the children. After a background check, she was advised she could not get custody because of a fourth-degree gross sexual imposition conviction in 1982. However, she was able to obtain custody of two young family members, ages one and two months, in the early 90's, and she received custody of two more family members in the mid 90's.

{¶61} Great-grandmother Sanetta attended every visit, and would bring food and goodie-bags for J.B. and her cousin, as well as for appellant. She testified that the children looked forward to seeing her, and Fraley, who had visited her two-bedroom apartment, deemed it appropriate. She stated she had enough space for J.B. and would provide good care if she were placed with her. She relied on social security disability income for her financial support.

{¶62} She testified that appellant may be mature enough, but did not have the means to take on the parental responsibility.

**GAL**

{¶63} The GAL prepared a report prior to the permanent custody trial. In his report, he noted appellant initially showed a willingness to work the case plan, but CCDCFS filed the motion for permanent custody when she began to show a lack of commitment. The GAL also noted the recent delinquency charges, which he felt raised questions concerning the safety of the child if J.B. were returned to appellant. He

expressed his disappointment with appellant's lack of concern as to how her behavior will affect the custody matter. The GAL recommended that legal custody be granted to Great-grandmother Sanetta, because she has demonstrated her concern about the welfare of J.B. and indicated her willingness to raise J.B.

{¶64} At trial, the GAL reiterated his recommendation, but acknowledged he had not observed J.B. in her foster family for "a while," the last observation being "some time ago."

{¶65} On June 4, 2012, the trial court issued a decision committing J.B. to the permanent custody of CCDCFS. Appellant timely filed this appeal.[1]

---

[1] Grandmother Angelique and Great-grandmother Sanetta also appealed the trial court's decision. Those appeals are separately before this court, in Nos. 98566 and 98567 and Nos. 98518 and 98519, respectively.

## Appeal

**{¶66}** We begin with the recognition that "a parent's right to raise a child is an essential and basic civil right." *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997). "The permanent termination of parental rights has been described as the family law equivalent of the death penalty in a criminal case." *In re Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, ¶ 14. "All children have the right, if possible, to parenting from either natural or adoptive parents which provides support, care, discipline, protection and motivation." *In re Hitchcock*, 120 Ohio App.3d 88, 102, 696 N.E.2d 1090 (8th Dist.1996). This court has also emphasized that the "termination of the rights of a birth parent is an alternative of last resort." *In re Gill*, 8th Dist. No. 79640, 2002-Ohio-3242, ¶ 21. "The purpose of the termination of parental rights statutes is to facilitate adoption and to make a more stable life for dependent children." *In re Howard*, 5th Dist. No. 85 A10-077, 1986 Ohio App. LEXIS 7860, *5 (Aug. 1, 1986).

## The Two-Prong Permanent Custody Analysis

**{¶67}** R.C. 2151.414 sets forth a two-prong analysis to be applied by a juvenile court in adjudicating a motion for permanent custody. R.C. 2151.414(B). It authorizes the juvenile court to grant permanent custody of a child to the public agency if, after a hearing, the court determines, by clear and convincing evidence, that any of the four factors apply: (a) the child is not abandoned or orphaned, but the child cannot be placed with either parent within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned, and there are no relatives of

the child who are able to take permanent custody; or (d) the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period. R.C. 2151.414(B)(1)(a)-(d).

{¶68} If any of these factors exists, the trial court proceeds to analyze whether, by clear and convincing evidence, it is in the best interests of the child to grant permanent custody to the agency.

### First Prong: R.C. 2151.414(B)(1) Factors

{¶69} R.C. 2151.414(B)(1) contains four factors. When the child is neither abandoned nor orphaned, the court considers the possibility of reunification ("whether the child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents"), or whether the child has been in an agency's temporary custody for 12 out of 22 consecutive months.

{¶70} Regarding the reunification factor, R.C. 2151.414(E) enumerates 16 factors for the trial court to consider as to whether the child should be placed with either parent. These factors include, among others, whether the parent failed to substantially remedy the conditions causing the removal of the child, and whether the parent demonstrated a lack of commitment.

{¶71} The 12 out of 22 months provision provides parents with 12 months to work toward reunification and "balance the importance of reuniting a child with the child's

parents against the importance of a speedy resolution of the custody of a child." *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 21.

{¶72} Only one of the four factors must be present for the first prong of the permanent custody analysis to be satisfied.

### Second Prong: Best Interest of the Child Analysis

{¶73} Once the juvenile court ascertains that one of the four factors listed in R.C. 2151.414(B)(1) is present, then the court proceeds to an analysis of the child's best interest.

{¶74} In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D)(1) mandates that the juvenile court must consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section

apply in relation to the parents and child.

**Standard of Review**

{¶75} R.C. 2151.414 requires the court to find, by clear and convincing evidence, (1) one of the factors enumerated in R.C. 2151.414(B)(1)(a)-(d), and (2) an award of permanent custody is in the best interest of the child. Clear and convincing evidence is that which will produce in the trier of fact "'a firm belief or conviction as to the facts sought to be established.'" *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. While requiring a greater standard of proof than a preponderance of the evidence, clear and convincing evidence requires less than proof beyond a reasonable doubt. *In re Parsons*, 9th Dist. No. 97CA006662 and 97CA006663, 1997 Ohio App. LEXIS 5141 (Nov. 12, 1997).

{¶76} As for our own role on appeal from the trial court's decision, we are cognizant that a juvenile court's termination of parental rights and award of permanent custody to an agency is not reversed unless the judgment is not supported by clear and convincing evidence. *In re: Dylan C.*, 121 Ohio App.3d 115, 121, 699 N.E.2d 107 (6th Dist.1997).

{¶77} Appellant raises three assignments of error for our review.

{¶78} Under her first assignment of error, mother claims the trial court's decision to grant permanent custody of J.B. to CCDCFS is against the manifest weight of the evidence and is not supported by clear and convincing evidence.

**{¶79}** Under the second assignment of error, she claims the trial court erred by adjudicating the child neglected and dependent and by awarding permanent custody to the agency based on improperly admitted evidence.

**{¶80}** Under her third assignment of error, mother claims "the judgment is contrary to law because the agency failed to make reasonable efforts to place the child with a suitable relative in violation of the child's best interest."

**{¶81}** We begin with the first and third assignments, which concern whether the trial court properly applied the two-prong analysis before granting permanent custody to CCDCFS. We address them together due to their interrelationship in this case.

### The Trial Court's Findings Regarding the First Prong

**{¶82}** Regarding the first prong, CCDCFS established, and the trial court found, that one of the conditions set forth under R.C. 2151.414(B)(1) was satisfied — J.B. "has been in temporary custody of a public children services agency * * * for twelve or more months of a consecutive twenty-two month period."

**{¶83}** This finding is supported by the record. Pursuant to R.C. 2151.414(B)(1), a child is considered to have entered the temporary custody of an agency "on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home."

**{¶84}** In this case, the agency removed J.B. from the home on January 29, 2009; thus, the date that is 60 days after the removal is March 29, 2009. The court adjudicated J.B. neglected and dependent on July 30, 2009. The earlier of these two dates is March

29, 2009. The agency filed its motion for permanent custody on January 28, 2011. Therefore, under R.C. 2151.414(B)(1), J.B. is deemed to be in the temporary custody of CCDCFS for over 12 months, 22 months to be exact. Thus, the trial court's determination regarding the R.C. 2151.414(B)(1)(d) factor is supported by clear and convincing evidence in the record.

{¶85} Because one of the four R.C. 2151.414(B)(1) factors existed, the factors set forth in R.C. 2151.414(B)(1)(a) (the possibility of placement with either parent within a reasonable time) is not determinative in this case. *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 21; *see also In re D.A.* 8th Dist. No. 95188, 2010-Ohio-5618, ¶ 44. "The court does not need to determine that the child cannot or should not be placed with either parent within a reasonable time [when] the child has been in the temporary custody of one or more public children services agencies for more than 12 of the last 22 months." *In re M.H.*, 8th Dist. No. 80620, 2002-Ohio-2968, ¶ 25; *see also In re William S.*, 75 Ohio St.3d 95, 99, 1996-Ohio-182, 661 N.E.2d 738. The Supreme Court in *In re C.W.* explained that the R.C. 2151.414(B)(1)(a) factor needs not be considered once the "12 months of 22 month" factor is present because the latter provision already provides parents with 12 months to work toward reunification and it "balance[s] the importance of reuniting a child with the child's parents against the importance of a speedy resolution of the custody of a child." *Id.* at ¶ 22.

{¶86} Although the trial court in this case did not have to engage in an R.C. 2151.414(B)(1)(a) analysis (the possibility of placement with either parent within a

reasonable time), the trial court here did engage in such an analysis, applying several pertinent factors enumerated in R.C. 2151.414 (E), which, as we stated above, include whether the parent failed to substantially remedy the conditions causing the removal of the child, despite reasonable case planning and diligent efforts by the agency.

**{¶87}** Applying pertinent R.C. 2151.414(E) factors, the trial court found that despite the agency's efforts to return the child to the home and provision of services to address mother's anger management, emotional stability, education, and parenting issues, appellant has failed continuously and repeatedly to substantially remedy the conditions that caused J.B. to be placed outside of her home. Moreover, the trial court found that appellant "has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child" (R.C. 2151.414(E)(4)), and was unwilling to provide for the child's basic necessities.

**{¶88}** Our review of the trial transcript supports the trial court's findings because CCDCFS presented evidence to demonstrate that appellant had failed to achieve the objectives of the case plan despite the various services and programs provided to her.

**{¶89}** Appellant's attendance and participation in those services and school was an ongoing problem, but she did complete two parental skills programs (in Dasi Aiyad Family Institute and DePaul's Family Center).

**{¶90}** Regarding appellant's contention that she completed most of the services required by the case plan, we first note that substantial compliance with a case plan is not

necessarily dispositive on the issue of reunification and does not preclude a grant of permanent custody to a social services agency. *In re C.C.*, 187 Ohio App.3d 365, 2010-Ohio-780, 932 N.E.2d 360, ¶ 25 (8th Dist.). Moreover, it must be noted that because a parent completes the terms of a case plan does not mean she has achieved the ultimate goals of the plan or that, most importantly, she has substantially remedied the conditions that caused the children to be removed. *Id.* "The issue is not whether the parent has substantially complied with the case plan, but whether the parent has substantially remedied the conditions that caused the child's removal." *In re McKenzie*, 9th Dist. No. 95CA0015, 1995 Ohio App. LEXIS 4618 (Oct. 18, 1995).

{¶91} Indeed, despite appellant's completion of two parental programs and despite the counseling services provided her to address her anger problem, appellant continued to display poor decision-making, which compromised the safety of the children in her care. She continued to display an inability to control her anger outbursts.

{¶92} In an incident that occurred a month before the permanent custody hearing, appellant left a three-year-old who was in her care unattended while she engaged in a fight. The fight again resulted in charges of delinquency against her. She was also known to put J.B. on the hood of a car at 2:00 a.m. when J.B. did not sleep during one of the in-home overnight visits.

{¶93} Appellant's case plan required her to attend J.B.'s medical appointments so that she would understand the child's conditions and how best to address them.

{¶94} J.B. had health problems that required significant medical attention. Appellant participated in medical appointments when the foster mother provided the transportation. Appellant's participation stopped when she was responsible for her own transportation. She also appeared inattentive to J.B.'s physical condition, such as diaper rash, and hygiene on several occasions.

{¶95} Therefore, although the trial court need not make the R.C. 2151.414(B)(1)(a) finding in this case, it did. And, based on the trial testimony, we find that there was clear and convincing evidence to support the court's determination that J.B. cannot be placed with appellant within a reasonable time, because, despite reasonable case planning and diligent efforts by the agency, appellant failed to remedy the conditions that caused J.B.'s removal.

### The Trial Court's Findings Regarding the Second Prong (Best Interest of the Child)

{¶96} Turning now to the second prong of the permanent custody analysis, R.C. 2151.414(D)(1)(a) through (e) set forth the relevant factors that a court should consider in determining the best interest of the child. The satisfaction of one of these enumerated factors permits an award of permanent custody. *In re D.A.*, 8th Dist. No. 95188, 2010-Ohio-5618, ¶ 46; *In re Moore*, 8th Dist. No. 76942, 2000 Ohio App. LEXIS 3958 (Aug. 31, 2000), citing *In re Shaeffer Children*, 85 Ohio App.3d 683, 621 N.E.2d 426 (3d Dist.1993).

{¶97} In addition, this court has expressed the view that the discretion that a trial court has in custody matters should be accorded the utmost respect, given the nature of

the proceeding and the impact the court's determination will have on the lives of the parties concerned. *In re L.C.*, 8th Dist. No. 93657, 2010-Ohio-778, ¶ 16, citing *In re Satterwhite*, 8th Dist. No. 77071, 2001-Ohio-4137.

**{¶98}** Here, the trial court found by clear and convincing evidence that the granting of permanent custody was in J.B.'s best interest, upon considering the following: (1) the interaction and interrelationship of the child with her parents, siblings, relatives, and foster parents; (2) the custodial history of the child; and (3) the child's need for a legally secure placement and whether such a placement can be achieved without permanent custody.

**{¶99}** Applying these statutory factors, the trial court recognized that appellant demonstrated love and affection for the child, but noted that "Mother [appellant] became pregnant at 13. Now 17, mother [appellant] lacks the maturity both as to her own needs and the needs to parent a child." The court observed that appellant "has not consistently been compliant with home rules and expectations. At times, mother has failed to submit to the authority of the maternal grandparents, posing a risk to herself, the child and others." The trial court also found the likelihood of recurrence of neglect makes J.B.'s placement with her a threat to J.B.'s safety.

**{¶100}** The trial court considered whether other relatives were available for legal custody. The court made the following findings: "Maternal grandmother has made insufficient progress for reunification. Maternal grandmother continues to provide primary care for four minor children in her home, including the mother herein, and their

needs; such that maternal grandmother was not always able to get mother to appointments with the child herein, or to more than 30% of scheduled visits."

{¶101} Regarding Great-grandmother Sanetta, the trial court noted she has made some progress toward her case plan objectives; however, the agency remained concerned regarding her health. The court also noted that the social worker on the case had learned she was receiving mental health services, but Great-grandmother would not disclose her diagnosis, what she was receiving the treatments for, and the treatment requirements.

{¶102} The trial court therefore concluded it is in the best interest of J.B. to grant permanent custody to CCDCFS. Our own independent review of the record indicates the trial court had considered the requisite statutory factors and its determination is supported by clear and convincing evidence contained in the record.

{¶103} The record reflects that J.B. was removed from appellant's care when J.B. was only three months old. Following placement into J.B.'s current foster family in August 2009, J.B. remained in that family for over two years by the time the trial for permanent custody was held in November 2011.

{¶104} While appellant visited with J.B., she was often very late and at times relied on other family members to attend to J.B.'s needs. When the agency instituted visits in the home, the visits had to be changed back to supervised visits because of mother's poor decision making. The GAL had concerns about appellant's behaviors and her delinquencies, was disappointed with appellant's lack of concern for how her

behavior would affect the custody of her child, and also expressed concern for the safety of the child if J.B. were returned to appellant's care.

**{¶105}** Regarding a placement with either Grandmother Angelique or Great-grandmother Sanetta, the social workers testified that grandmother repeatedly indicated she was overwhelmed. Grandmother also was unemployed. Additionally, CCDCFS had concerns that grandmother had been in a relationship with a man with a criminal history of offenses against children and grandmother still referenced this individual in conversations. The GAL indicated that "maternal grandmother tends to back her daughter even when the evidence shows otherwise." The GAL questioned whether grandmother would protect and nurture the child if given custody.

**{¶106}** Great-grandmother Sanetta moved from Texas to Cleveland when J.B. was taken into custody in 2009. Although the trial court recognized Great- grandmother had made progress toward her case plan objectives, the court also recognized her health issues. In addition, Great-grandmother was not aware of appellant's more recent troublesome and problematic behavior.

**{¶107}** We are aware that the GAL found Great-grandmother had demonstrated her concern about J.B.'s welfare and indicated her willingness to raise J.B. He recommended a granting of the legal custody to Great-grandmother Sanetta.

**{¶108}** The GAL acknowledged, however, that it been a long time since he had observed the child in the foster family's home. Furthermore, a trial court is bound to consider, but not bound to accept, the recommendation of the guardian ad litem, the

agency, or any other parties.   The ultimate decision is for the trial court, and it must act upon complete consideration of all evidence presented.   *In re T.S.*, 8th Dist. No. 92816, 2009-Ohio-5496, ¶ 34.

{¶109}   We further note that "[t]he statute does not make the availability of a placement that would not require a termination of parenting rights an all-controlling factor [and] does not even require the court to weigh that factor more heavily than other factors."   *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 63. Rather, the statute "requires the court to find the best option for the child[.]" *Id.*

{¶110} We recognize J.B.'s biological family has shown a strong desire for her to be returned to them.   J.B. appears to have a positive relationship with the biological family members.   We respect and commend the love and commitment some members of J.B.'s biological family have demonstrated to her at various times.   We must, though, consider the full record before us.   No child can be truly safe, secure, and successful without dependable, consistent care.   Reliance upon members of a multi-generational family to alternatively respond to the hour by hour needs of a young child, when they can manage it, is not tolerable when full-time commitment is needed.

{¶111} Family unity and blood relationship are vital factors to carefully and fully consider in all custody matters.   To protect the child's interest, though, biological relationship cannot be controlling in itself.   *In re T.W.*, 8th Dist. Nos. 86084, 86109, and 86110, 2005-Ohio-6633, ¶ 15.   Nor is the existence of a positive relationship, in itself,

controlling. *Id.* The paramount consideration remains the best interest of the child. All relevant factors must be weighed when making this determination.

{¶112} This child has an extensive history of medical challenges and family dislocation. With great care, we note that, although appellant has made some progress in attending programs and services the agency prescribed for her, and has professed a strong love and affection for J.B., our responsibility in this child-well-being matter is to effectuate that "it is axiomatic that the best interest determination focuses on the child, not the parent." *In re D.A.*, 8th Dist. No. 95188, 2010-Ohio-5618, ¶ 53.

{¶113} While appellant continued to exhibit conduct that reflects she had not achieved the objectives of her case plan, a plan designed to address her mental stability, decision-making skills, and parenting skills, J.B., together with her cousin, was cared for by their foster parents in a much-needed steady, secure, and nurturing environment. The foster mother testified to a strong bond between J.B. and her and her husband.

{¶114} We underscore that J.B. had significant health problems that required significant medical attention. The foster parents attended to all J.B.'s medical needs and ensured she underwent necessary medical procedures and treatments. Appellant, though, failed to attend, as required by her case plan, many of these visits to the doctors because of her inability to obtain transportation. She also appeared inattentive to her child's physical condition and needs. As reflected in the record, her ability to properly care for J.B. is an ongoing cause of concern.

{¶115} J.B. is and has been at the most critical developmental stage of her life. She, as all children do, need to be cared for and nurtured in a stable, secure, and structured environment. After a full and careful review of the 1,022-page transcript of the three-day trial, we agree with the trial court that such an environment can only be ensured in this matter by granting permanent custody to the CCDCFS.

{¶116} We further recognize that the trial court's decision is consistent with the Ohio General Assembly's intent to ensure the timely placement of children into a permanent home. After being in the temporary custody of the agency for nearly all of her life, permanency for J.B. is long overdue. "[N]eglected and dependent children are entitled to stable, secure, nurturing and permanent homes in the near term * * * and their best interest is the pivotal factor in permanency case." *In re T.S.,* 8th Dist. No. 92816, 2009-Ohio-5496, at ¶ 35.

{¶117} Upon a thorough review of the record, we find the trial court's determination is supported by clear and convincing evidence. The first and third assignments of error lack merit.

### Whether Testimony Was Improperly Admitted

{¶118} Under the second assignment of error, appellant raises two evidentiary issues. First, appellant claims the trial court erred by admitting the testimony of Officer Omar Maxel concerning the October 7, 2011 incident.

{¶119} Officer Maxel testified that he responded to a call reporting a fight in the parking lot of a shopping center. Upon arrival, the officer learned from the store

employees and several victims that appellant had instigated a fight, and left her three-year-old stepsister behind and alone in a store. The officer testified to information he learned in the course of his investigation and also testified to his own observations of appellant's yelling, screaming, and fighting with the officers upon her arrest and while in the police station. Among the charges filed against her from this incident was child endangering

{¶120} Appellant argues that this was improper character evidence under Evid.R. 404(A) and 404(B). Pursuant to Evid.R. 404(A), "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Pursuant to Evid.R. 404(B), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."

{¶121} We do not agree with this contention. The evidence regarding the incident was not introduced to prove "an action in conformity therewith on a particular occasion." Rather, the evidence is permitted under Evid.R. 405(B), which states that "in cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct." The officer's testimony regarding the store incident was evidence reflecting on whether appellant was able to adequately care for a child, and therefore relevant to the court's determination of whether a grant of permanent custody is in the best interest of the child.

{¶122} Appellant claims the officer's testimony contained inadmissible hearsay regarding what others told him about the circumstances of the fight. To the extent the officer's testimony contained inadmissible hearsay, we find any error in the admission of this testimony harmless and did not prejudice appellant's substantial rights. Appellant herself admitted during her testimony that it was not a good decision to engage in fighting and leave her three-year-old stepsister alone in the store.

{¶123} Second, appellant claims the trial court erred by admitting evidence of Great-grandmother Sanetta's 1982 conviction. Evid.R. 609(B) does not preclude the admission of evidence of a conviction more than ten years old if "the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect," and advance notice of intent to use the conviction is provided. We note that it has not been shown that the use of this conviction was challenged in the trial court. Further, even if the evidence should have been excluded, we again find any error was harmless, because there was substantial evidence to support the trial court's determination that an award of permanent custody to CCDCFS was in the best interest of J.B. in light of all of the factors considered. Accordingly, the second assignment of error is overruled.

{¶124} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the juvenile court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
TIM McCORMACK, JUDGE

SEAN C. GALLAGHER, J., CONCURS;
LARRY A. JONES, SR., P.J., DISSENTS (WITH SEPARATE OPINION ATTACHED)

LARRY A. JONES, SR., P.J., DISSENTING:

**{¶125}** Respectfully, I dissent and conclude that the trial court abused its discretion   when it determined that the grant of permanent custody to CCDCFS was in the best interest of the child.   Instead, I would award legal custody of J.B. to the maternal great-grandmother with the agency having protective supervision.   *See In re J.B.*, 8th Dist. Nos. 98518 and 98519 (great-grandmother's appeal).

**{¶126}** The termination of parental rights is "the family law equivalent of the death penalty in a criminal case; therefore, parents must be afforded every procedural and substantive protection the law allows."   (Citations omitted.)   *In re D.A.*, 113 Ohio St.3d 88, 91, 2007-Ohio-1105, 862 N.E.2d 829.   "The termination of parental rights should be an alternative of 'last resort.'" *Id.* citing *In re Cunningham*, 59 Ohio St.2d 100, 105, 391 N.E.2d 1034 (1979).

**{¶127}** As the majority opinion recognizes, because J.B. had been in the custody of CCDCFS for more than 12 months out of a 22-month period, the trial court had only to

conclude what was in the child's best interest pursuant to R.C. 2151.414(D).    I will address the best interest factors in turn.

{¶128} The first factor involves the interaction and interrelationship of the child with her parents, siblings, and other relatives and significant people in her life.    R.C. 2151.414(D)(1)(a).    This best interest factor is "highly significant" and "focuses on a critical component of the permanent custody test:    whether there is a family relationship that should be preserved."    *In re A.W.*, 9th Dist. No. 09CA009631, 2010-Ohio-817, ¶ 14, citing *In re C.M.*, 9th Dist. No. 21372, 2003-Ohio-5040, ¶ 11.

{¶129} The majority of the evidence before the trial court on this factor weighs in favor of preserving the family relationship.    J.B.'s mother had participated in case plan services and has shown a bond with her child.    She attended visitation, was loving towards her child, and was alert to her child's needs.    Although the record evidenced that the mother is not ready to take custody of her daughter, if legal custody is granted to the maternal great-grandmother then the ties between mother and child, and between the child and her relatives, will remain.

{¶130} As to R.C. 2151.414(D)(1)(b), the GAL for the child reported that the child was too young to indicate her wishes.    The GAL recommended against a grant of permanent custody, finding that a permanent sever of family ties was inappropriate because suitable family members were willing to take custody of the child and the extended family had demonstrated its commitment to J.B.    The GAL recommended legal custody be granted to the great-grandmother; finding that she would    encourage

visitation with and possible reunification of child with the mother, but would put the best interests of the child first, even if it conflicted with the mother's desires.

{¶131} In relation to the custodial history of the child under R.C. 2151.414(D)(1)(c), the delay in determining the permanent custody motion was unjust to all parties involved. The agency filed for permanent custody on January 28, 2011. Trial on the motion began on November 17, but was continued until January 24, 2012, at the request of the family. Trial continued on January 24 and was then continued again until March 21 and 22, 2012, for additional testimony.

{¶132} Thus, it took the trial court 10 months from the time the motion for permanent custody was filed to commence trial and then another four months for the trial court to finish three more days of testimony. Trial ended on March 22, 2012, but the trial court did not issue its decision until June 4, 2012. Consequently, J.B. spent approximately 17 months in the agency's custody from when the motion for permanent custody was filed until the trial court ruled on the motion.

{¶133} Although I understand that there were some issues that may have delayed the trial, to me, 17 months from motion filed to motion decided is an unacceptable length of time, especially given the young age of the child.

{¶134} Considering R.C. 2151.414(D)(1)(d), and whether J.B.'s need for legally secure permanent placement can be achieved without a grant of permanent custody, the transfer of legal custody to a suitable relative achieves that goal without taking the drastic step of permanently divesting the mother of her residual parental rights, privileges, and

responsibilities. *See generally In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, 843 N.E.2d 1188, paragraph one of the syllabus.

{¶135} As the majority opinion acknowledges, when the child was initially taken into custody, the great-grandmother relocated from Texas to Cleveland for the sole purpose of assisting her family. The social worker testified that the great-grandmother attends visitation with the child every week, often being the first family member to arrive, always brings snacks for the child, and stays for the entire three-hour visit. The social worker further testified that the great-grandmother has suitable housing, receives income from Social Security, and is a good parenting role model. In fact, overnight visitation with the mother and child happened at the great-grandmother's home.

{¶136} Moreover, after the great-grandmother was added as a party to the case, the agency filed an amended case plan requiring her to complete a parenting course and sign a medical release for her mental health service provider; she completed both objectives.

{¶137} The majority asserts that because applicable statutes do not require a court to consider placing a child with a relative before granting permanent custody to a state agency and because the juvenile court has discretion to determine what placement option is in the child's best interest, the court in this case did not err in its assessment of what was in the child's best interests. While the premise as stated above may be true, I disagree that the court's decision was supported by clear and convincing evidence. The best option, the best interest of this child, is to retain the ties she has with her biological

family.    Moreover, the fact that there is a suitable, loving, and committed relative placement with the great-grandmother cannot be discounted.[2]

{¶138} Finally, the factors listed in R.C. 2151.414(E)(7) to (11) include a parent's criminal convictions, whether the parent has withheld medical treatment or food from the child, has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse, abandoned the child, and whether the parent has previously had her or his parental rights terminated as to another child. There is no dispute that none of the factors apply in this case.   It is important to note, however, that the fact that none of these factors apply weighs in favor of the mother and against a grant of permanent custody.

{¶139} Thus, I advocate that legal custody of J.B. be granted to the great-grandmother with the agency providing protective supervision.

{¶140} Even though the mother was only 13 years old when she gave birth to J.B., almost four years has passed, and, without a doubt, the mother has a strong and loving family network.   The fact of the matter is, even if the child's mother is not presently able to parent her child, a legally secure family placement exists that would save the court from taking the drastic, harsh, and irrevocable step of terminating the mother's parental

---

[2] When placement with the great-grandmother was discussed at trial, the agency asserted it could not place the child with her because of her criminal conviction.   But even if the agency was prohibited from placing the child with her, the same does not apply to the court.   While Ohio Adm. Code 5101:2-42-18(F) and 5101:2-7-02(K) may prevent a public children services agency from placing children in a relative's home if the relative or another adult living in the home has a sexual assault conviction, this prohibition does not apply to the courts.   *See In re Needom*, 1st Dist. Nos. C-080107 and C-080121, 2008-Ohio-2196, ¶ 23.   ("Theoretically, a court could still award custody even though the relative or other adult in the home has a conviction.")

rights. Simply put, to permanently cut the bonds of this family to J.B. would not be in the child's best interests and the state failed to show otherwise by clear and convincing evidence.

{¶141} In light of the above, I would find that the trial court abused its discretion in granting the motion for permanent custody as to J.B. I would: (1) reverse the trial court's decision granting permanent custody to CCDCFS; (2) grant legal custody with protective supervision of J.B. to the great-grandmother.