[Cite as *In re L.S.*, 2021-Ohio-510.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE L.S.                                      :
                                                :
                                                :          No. 109995
A Minor Child                                   :
                                                :
[Appeal by Lat.S., Mother]                      :

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** February 25, 2021

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD20902321

***Appearances:***

Rick L. Ferrara, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee* Cuyahoga County Division of Children and Family Services.

EILEEN A. GALLAGHER, J.:

{¶ 1} Appellant-mother Lat.S. ("Mother") appeals from the decision of the Juvenile Division of the Cuyahoga County Court of Common Pleas ("the juvenile court") terminating her parental rights and granting permanent custody of her

daughter, L.S., to the Cuyahoga County Division of Children and Family Services

("CCDCFS" or "the agency").   For the following reasons, we affirm.

**Factual Background and Procedural History**

{¶ 2}   On February 24, 2020, CCDCFS filed a complaint for neglect and

permanent custody of L.S. (date of birth March 22, 2008) with the juvenile court.

The complaint alleged:

1.  The child was previously adjudicated dependent due to mother's incarceration and the child's significant mental health and behavioral issues.   The child was initially committed to the temporary custody of CCDCFS but was subsequently reunified with the mother in November, 2019, with protective supervision by CCDCFS. * * *

2.  Mother's whereabouts have been unknown since February 18, 2020, and mother has failed to make an appropriate plan of care for the child.

3.  Mother has a mental health condition which requires on-going treatment.

4.  Alleged father John Doe has failed to establish paternity and has failed to support, visit, or communicate with the child since birth.[1]

Reasonable efforts were made by Cuyahoga County Division of Children and Family Services to prevent removal of the child from the home and removal is in the best interest of the child.

The child was removed by law enforcement on February 22, 2020, pursuant to §2151.31(A)(6) of the Ohio Revised Code and Juv.R. 6(A)(3).

---

[1] L.S.'s father has never been named by Mother or otherwise identified.  Accordingly, we do not further address her father in this appeal.

{¶ 3} The agency also filed a motion for predispositional temporary custody, alleging that L.S. was in immediate danger from her surroundings and that removal was necessary to prevent immediate or threatened physical or emotional harm. In support of the motion, CCDCFS submitted an affidavit from Ernese Williams, an extended service social worker at CCDCFS, who averred that L.S. had been present when Mother's girlfriend, who had been caring for L.S., overdosed on illegal drugs and subsequently died, and that Mother could not be found.

{¶ 4} On that same date, the juvenile court conducted a hearing on the motion. At the hearing, Williams testified that 11-year-old L.S. "came into our Agency on early Saturday morning on a JR6 [a removal of a child by law enforcement] after being left with inappropriate caregivers," that Mother's whereabouts had been unknown for almost a week and that L.S. had no other relatives in Cleveland with whom she could be placed.

{¶ 5} After the hearing was concluded, the juvenile court granted CCDCFS' motion for predispositional custody and committed L.S. to the emergency temporary care and custody of CCDCFS.

{¶ 6} In June 2020, CCDCFS filed a case plan that required Mother to undergo a drug and alcohol assessment and psychological evaluation, successfully complete any recommended treatment and aftercare, submit to random drug screens, acquire parenting skills to help L.S. function better and maintain L.S.'s mental health.

{¶ 7} CCDCFS filed an amended complaint, and an adjudicatory hearing was held on August 18, 2020. At the hearing, Mother stipulated to the following allegations of the amended complaint:

1. The child has been previously adjudicated [d]ependent due to mother's incarceration and the child's significant mental health and behavioral issues. The child was initially committed to the temporary custody of CCDCFS but was subsequently reunified with mother in November of 2019, with protective supervision by CCDCFS. * * *

2. Mother needs to ensure that the basic needs of the child are met and to make appropriate plans if she is unable to provide care for the child.

3. Mother has mental health concerns which requires on-going services.

4. There is a parent/teen conflict despite mother engaging in case plan services during the child's prior custody episode.

{¶ 8} The juvenile court adjudicated L.S. to be a neglected child.

{¶ 9} On August 20, 2020, Mother filed a "Motion for Legal Custody to Mother with Protective Supervision to CCDCFS Pursuant to R.C. §2151.353(A)(1), (3) or — in the Alternative — for Temporary Custody to CCDCFS Pursuant to R.C. §2151.353(A)(2)(a)" ("motion for legal custody"). Mother asserted that she "loves her daughter deeply," that she has "complied with case plan services and will continue to do so," that she has "stable income and stable, independent housing" and that she "wants to engage in counseling with her daughter, a desire CCDCFS has not yet facilitated." She argued that CCDCFS' request for permanent custody was "premature," that, given her age, L.S. "may not fully grasp permanent custody" (e.g.,

Mother claimed that L.S. had informed the guardian ad litem that although she did not want to return to Mother's home, she wished to visit with Mother)[2] and that it was not in L.S.'s best interest to "sever her relationship" with Mother.

{¶ 10} On August 24, 2020, the case proceeded to a dispositional hearing. At the time of the hearing, L.S. was 12. Williams testified on behalf of CCDCFS at the hearing.

{¶ 11} Williams testified that she had been involved with the family since 2017. At that time, Mother was incarcerated for robbery and L.S. was in the care of her maternal grandmother. Williams indicated that because Mother had been "in and out" of prison, L.S. had been raised largely by her grandmother and had also spent some time with another relative in Columbus.

{¶ 12} Williams explained that in 2017, when L.S. was nine, L.S.'s grandmother was unable to continue to care for L.S. because L.S. "was having some behaviors that was a little bit too much for the grandmother" and "mental health issues" the grandmother was unable to address. As a result, L.S. was placed in the temporary custody of CCDCFS. According to Williams, at that time, L.S. was "running out of school, placing herself at risk, and grandma could not keep her safe."

{¶ 13} Williams testified that L.S. was then placed in series of foster care homes, i.e., "six foster homes in a month or a month and a half," and that she would run away from each, "walk[ing] out in the street with no shoes on, just putting

_____

[2] Although Mother asserted in her motion that L.S. had indicated that she wants to visit with Mother, there is nothing in the record that supports this assertion.

herself at risk," until she was placed at Guidestone, a locked group home facility, where she remained for two years. Williams indicated that, at Guidestone, they were able to address "a lot of the issues" but that L.S. was "still having some issues there."

{¶ 14} Williams stated that Mother was engaged in services while in prison and had completed parenting classes and drug treatment before she was released. She stated that after Mother was released from prison, she continued to engage in services, specifically, mental health services, made an effort to engage in family counseling with L.S., and maintained sobriety.

{¶ 15} Williams testified that despite Mother's efforts, L.S., who was 10 or 11 at the time, often refused to participate in family counseling, was "continuously saying that she didn't want to engage in services" and said that "didn't want to go home to mom." Williams stated: "When asked why she didn't want to go home, she didn't have a solid reason as to why. She just would say she didn't know, she just don't want to go."

{¶ 16} Ultimately, in late 2019, CCDCFS filed a motion to terminate temporary custody. Williams stated that Mother had established stable housing, was actively engaged in mental health services, was maintaining her sobriety and was providing for L.S., "sending clothes, shoes, whatever was necessary to her daughter." Williams indicated that "[e]very now and then," Mother and L.S. would have weekend visits. She explained that visits were scheduled for every weekend and that there were no problems when L.S. went actually home for the weekend but that L.S. would just "pick and choose when she wanted to go" and would

"consistently have issues with going to the visit with mom."  Williams stated that Mother had done "everything she was supposed to do," that L.S. "wasn't giving * * * any real reason as to why she didn't go home" and that the agency felt that it was necessary for L.S. to go home "in order for them to rebuild their relationship." Williams stated that L.S. has an IEP for behavior but that she is smart and capable of learning.

{¶ 17} The juvenile court granted the motion to terminate temporary custody, and L.S. returned home to live with Mother in November 2019.

{¶ 18} Williams stated that L.S. was "trick[ed]" into going back home. According to Williams, L.S. was told that she was meeting Mother for lunch at Chipotle, Guidestone met Mother at the Chipotle "to do the transition just to make it easier" and Mother then took L.S. home.  Williams said L.S. "was okay with going to have lunch, but she didn't want to go home."

{¶ 19} Williams testified that after some initial adjustment issues, including a couple of incidents where L.S. would leave the house because she was upset, "things were starting to simmer down," L.S. "had stabilized very well" and it was "good for a while."  Several months later, however, just after the agency had filed a motion to terminate protective supervision,[3] Mother left L.S. with a

---

[3] On January 31, 2020, Williams wrote in an activity log: "[T]he family is functioning [in] a safe and healthy manner.  There are no concerns.  The Agency will file a motion to terminate COPPS."  On February 5, 2020, the agency filed a motion to terminate protective supervision in the prior case, AD17903153.

friend/roommate, N.C.,[4] who was unable to reach Mother. After Mother had been gone for a couple of days, N.C. began calling Williams "trying to get in touch with [Mother]." Williams stated that they were unable to reach Mother.

{¶ 20} Williams testified that N.C. took L.S. to her own daughter's home where N.C. overdosed on heroin and died while L.S. was present. Responding police officers then transported L.S. to CCDCFS, and CCDCFS filed its complaint for permanent custody. According to Williams, Mother's whereabouts were unknown for approximately two weeks, before and after L.S.'s placement with CCDCFS. During the time Mother was missing, Mother relapsed and abused cocaine.

{¶ 21} On March 2, 2020, Mother called Williams and told her she wanted to reengage in services and reunify with her daughter. Williams stated that Mother had admitted that she had a problem with cocaine abuse.

{¶ 22} Williams testified that Mother had a case plan for substance abuse treatment, parenting classes and mental health services (due to Mother's diagnosis of "bipolar with schizoaffect"). Williams stated that she did not need to make any referrals for Mother because Mother had already sought out and enrolled herself into a program at Recovery Resources in March 2020, which she completed in June 2020. Williams stated that Mother has "always been actively engaged in" and

---

[4] N.C. was living with Mother at the time L.S. returned home. Williams testified that she had met N.C. several times before L.S. returned home to Mother and that it was her understanding that N.C. was an alcoholic but that she was in recovery and sober. Williams stated that she did not believe, at the time that L.S. was returned to Mother's care, that N.C. was an inappropriate caregiver. It was only "in retrospect, based on what had happened" that it was determined that N.C. was an inappropriate caregiver.

"compliant with" mental health services provided by Frontline and compliant with her medication and stated that Mother had also enrolled herself in parenting classes.

{¶ 23} With respect to the parenting classes, Williams stated that the parenting classes consisted of eight sessions. Williams indicated that, at the time of the hearing, Mother had missed three of five sessions and had been an hour late for another but was "working towards" completion of that case plan objective.

{¶ 24} Williams testified that although Mother had provided "a number" of urine samples which were negative, she had tested positive for marijuana a week before the hearing. Williams stated that she had a conversation with Mother regarding the positive marijuana test and that Mother had agreed to go back into treatment.

{¶ 25} Williams stated that Mother had always maintained stable housing and, after March 2020, continued to meet the basic needs of L.S., purchasing personal items that Williams would bring to L.S. when Williams visited her. Williams stated that after L.S. was removed from Mother's custody, Mother maintained communication with L.S. through telephone calls and Facetime, but that L.S. had refused to visit with Mother. According to Williams, during her communications with L.S., Mother always expressed her love for L.S., her desire to visit L.S. and stated that she wants L.S. to return home, but that L.S. "at times will not reciprocate that" and will just say, "okay" rather than tell Mother that she loves her too.

{¶ 26} Williams estimated that L.S. has "actually lived" with Mother a total of "about two years * * * [s]poradically, not consistent two years" and that L.S. had spent most of her life outside her mother's care because Mother has "a long history of criminal activity and being in prison." Williams stated that when L.S. was at Guidestone, L.S. had "talked about" "not really having a relationship with her mom" and "now not knowing her." Williams testified that L.S. had been in her current foster home for "less than a month." According to Williams, L.S. "didn't do anything inappropriate" at her prior placement, but L.S. and the foster mother "didn't get along"; "[i]t was a mutual thing it wasn't a good fit." Williams stated that the foster mother in L.S.'s current placement has another child in permanent custody the same age as L.S., so L.S. "likes it there." Williams stated that L.S. has told her that she feels "comfortable" in her current placement and that L.S. feels the foster mother is "very down to earth," "listens to her" and "is open to understanding her."

{¶ 27} With respect to where she desires to live in the future, Williams testified that, at one point, L.S. was excited about the possibility of living with a friend of Mother's who was the mother of a Guidestone worker L.S. liked, but that L.S. later changed her mind and said she did not want to live with this friend. Williams stated that L.S. continues to express that she does not want to live with or visit Mother and has stated that "right now she wants to stay where she's at." Williams indicated that L.S. is "[s]cared" and that "she's expressed not trusting going back home and not knowing what happens if she goes back home during this custody episode."

{¶ 28} Williams was asked, under cross-examination, regarding L.S.'s "history with foster placements": "Her chances of permanency within a foster home seem to be very low. I mean, that's a fair statement, correct?" To which, Williams responded: "That's fair." However, Williams stated that, notwithstanding L.S.'s behavioral issues and temper, she believed there was "a possibility" that she "could try to find [L.S.] a parental home" if permanent custody was granted to the agency.

{¶ 29} Williams testified that CCDCFS decided to seek permanent custody because "the Agency just feels that it's time for [L.S.] to get some permanency. She's been through a lot and she's already content, you know, very adamant about not wanting to return home to mom. * * * [S]he just needs permanency." Williams acknowledged that L.S. is "manipulative" and would "ruin things" if she wanted to. She opined that there would no benefit to award temporary custody, rather than permanent custody, of L.S. to CCDCFS because "it's just been my experience with [L.S.] that she is set on not going back to her mom's house and she's gonna do whatever she can [to] not * * * go back to her mom's house."

{¶ 30} Mother did not testify and did not present any other witnesses at the permanent custody hearing.

{¶ 31} At the conclusion of Williams' testimony, the guardian ad litem made a recommendation, on the record, but not under oath or subject to cross-

examination, that the juvenile court grant permanent custody of L.S. to the agency.[5]

She explained:

> I just don't see where it would be beneficial for anybody for the Court to grant temporary custody instead of permanent custody at this time because I believe that knowing [L.S.] and how strong-willed she is, and how she has maintained the consistent refusal to go back to mom's house just as she did in the last case, I think we would be right back here in a matter of time.
>
> She doesn't want to go home and the only time in the almost three years that I've known her that she wanted to go home was the very first time that I met her, and * * * she had just been placed at Ohio Guidestone. * * * I'm not diminishing mom's efforts because I think mom has made efforts. * * * I don't think it's from mom's lack of effort. I just think this is a very difficult, strong-willed child and I think that sooner or later we're gonna be back here if the permanent custody is not granted today.

{¶ 32} In response to inquiry by the juvenile court, the guardian ad litem indicated that she had been the guardian ad litem in the prior case and that she believed, based on her conversations with L.S., that L.S. was "mature enough to understand" the proceedings and what the agency was requesting. No one else asked any questions of the guardian ad litem.

### The Juvenile Court's Decision to Grant Permanent Custody of L.S. to CCDCFS

{¶ 33} On September 2, 2020, the juvenile court issued a journal entry, terminating the prior order granting temporary custody of L.S. to CCDCFS,

---

[5] Although it appears from the transcript of the dispositional hearing that (1) the guardian ad litem submitted a written report and recommendation and (2) the juvenile court, Mother's counsel and counsel for CCDCFS all received copies of that written report and recommendation, it does not appear to have been filed with the juvenile court and it is not part of record forwarded to this court on appeal.

terminating the parental rights of Mother and L.S.'s father and ordering that L.S. be placed in the permanent custody of CCDCFS. The juvenile court also denied Mother's motion for legal custody. The juvenile court found that "in accordance with [R.C.] 2151.414(E), the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent" and that "permanent custody is in the best interest of the child in accordance with [R.C.] 2151.414(D)(1)."

{¶ 34} Specifically, with respect to its determination under R.C. 2151.414(E) that L.S. could not be placed be placed with Mother or should not be placed with Mother, the juvenile court found:

> Pursuant to R.C. 2151.414(E): * * *
>
> (13) The parent is repeatedly incarcerated, and the repeated incarceration prevents the parent from providing care for the child. *Mother has been in and out of the jail/prison and the child has only spent a total of approximately 2 years (not cumulatively) with mother in her 12 years of life.*
>
> (16) Any other factor the Court finds relevant: *There is significant parent/child conflict to the point that [CCDCFS] and the GAL don't believe it will ever be resolved.*

(Emphasis sic.)

{¶ 35} With respect to its determination that granting permanent custody to CCDCFS was in the best interest of L.S., the juvenile court stated:

> With respect to the best interest of the child, the Court has considered the following factors under O.R.C. 2151.414(D)(1):
>
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child. *Child does not have a bond with mother but is bonded with foster mother.*

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child. *Child does not wish to return home with mother.*

(c) The custodial history of the child, including whether the child has been in temporary custody of a public children services agency or private child placing agency under one or more separate orders of disposition for twelve or more months of a consecutive twenty-two month period. *Child was previously in agency custody.*

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency. *The child deserves a safe and stable environment where her needs are met. Child does not wish to return home with Mother. There are no other relatives that are willing and/or able to take the child into their homes.*

(e) Whether any of the factors in [R.C. 2151.414 (E)(7) to (11)] apply in relation to the parents and child.

(Emphasis sic.)

{¶ 36} The juvenile court further found that "reasonable efforts were made to prevent the removal of the child from the home, or to return the child to the home and finalize a permanency plan, to wit: reunification. Relevant services provided to the family include: Mother — Substance Abuse, Parenting, Mental Health and Housing. Child — Family Counseling."

{¶ 37} Mother appealed, raising the following assignment of error for review:

The trial court abused its discretion in awarding permanent custody because the state did not present sufficient, clear and convincing evidence necessary for the order.

**Law and Analysis**

{¶ 38} In her sole assignment of error, Mother argues that the juvenile court's award of permanent custody and termination of her parental rights was not supported by clear and convincing evidence.

{¶ 39} The right to raise one's own child is "'an essential and basic civil right.'" *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 67, quoting *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997); *see also In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990) (a parent has a "'fundamental liberty interest' in the care, custody, and management" of his or her child), quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). However, this right is not absolute. It is "'always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re L.D.*, 2017-Ohio-1037, 86 N.E.3d 1012, ¶ 29 (8th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979).

{¶ 40} Because termination of parental rights is "'the family law equivalent of the death penalty in a criminal case,'" *In re J.B.*, 8th Dist. Cuyahoga No. 98546, 2013-Ohio-1704, ¶ 66, quoting *In re Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, ¶ 14, it is "an alternative of last resort," *In re Gill*, 8th Dist. Cuyahoga No. 79640, 2002-Ohio-3242, ¶ 21. It is, however, "sanctioned when necessary for the welfare of a child." *In re M.S.*, 8th Dist. Cuyahoga Nos. 101693 and 101694, 2015-Ohio-1028, ¶ 7, citing *In re Wise*, 96 Ohio App.3d 619, 624, 645 N.E.2d 812 (9th Dist.1994). "'All children have the right, if possible, to parenting from either

natural or adoptive parents which provides support, care, discipline, protection and motivation.'" *In re J.B.* at ¶ 66, quoting *In re Hitchcock*, 120 Ohio App.3d 88, 102, 696 N.E.2d 1090 (8th Dist.1996). Where parental rights are terminated, the goal is to create "a more stable life for the dependent children" and to "facilitate adoption to foster permanency for children." *In re N.B.* at ¶ 67, citing *In re Howard*, 5th Dist. Tuscarawas No. 85 A10-077, 1986 Ohio App. LEXIS 7860, 5 (Aug. 1, 1986).

**Standard for Terminating Parental Rights and Granting Permanent Custody to CCDCFS**

{¶ 41} An agency may obtain permanent custody of a child in two ways. *In re J.F.*, 2018-Ohio-96, 102 N.E.3d 1264, ¶ 44 (8th Dist.), citing *In re E.P.*, 12th Dist. Fayette Nos. CA2009-11-022 and CA2009-11-023, 2010-Ohio-2761, ¶ 22. An agency may first obtain temporary custody of the child and then file a motion for permanent custody under R.C. 2151.413, or an agency may request permanent custody as part of its abuse, neglect or dependency complaint under R.C. 2151.353(A)(4). *In re J.F.* at ¶ 44. In this case, the agency sought permanent custody for L.S. as part of its complaint.

{¶ 42} When proceeding on a complaint with an original dispositional request for permanent custody, the trial court must satisfy two statutory requirements before a child can be placed in the permanent custody of a children's services agency. *In re J.F.* at ¶ 48. R.C. 2151.353(A)(4) provides that, if a child is adjudicated an abused, neglected or dependent child, the juvenile court may "[c]ommit the child to the permanent custody of a public children services agency,"

if the court determines (1) "in accordance with [R.C. 2151.414(E)] that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent" and (2) "in accordance with [R.C. 2151.414(D)(1)] that the permanent commitment is in the best interest of the child." In making these determinations, the juvenile court may not consider "the effect the granting of permanent custody to the agency would have upon any parent of the child." R.C. 2151.414(C).

{¶ 43} "A juvenile court's decision to grant permanent custody will not be reversed as being against the manifest weight of the evidence 'if the record contains some competent, credible evidence from which the court could have found that the essential statutory elements for permanent custody had been established by clear and convincing evidence.'" *In re G.W.*, 8th Dist. Cuyahoga No. 107512, 2019-Ohio-1533, ¶ 62, quoting *In re A.P.*, 8th Dist. Cuyahoga No. 104130, 2016-Ohio-5849, ¶ 16.

{¶ 44} "Clear and convincing evidence" is that "measure or degree of proof" that "produce[s] in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus; *In re M.S.*, 2015-Ohio-1028, at ¶ 8. "It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *Cross* at 477.

{¶ 45} In this case, Mother does not specifically challenge any of the juvenile court's findings. She simply argues, generally, that the juvenile court "abused its

discretion in awarding permanent custody to the [s]tate while not relying on * * * sufficient, probative evidence to support its finding to take custody of an 11 year old [sic] permanently from a mother who was overwhelmingly complying with [s]tate requirements." She further argues that the juvenile court "acted unreasonably and arbitrarily because it awarded custody to the State of Ohio without clear and convincing evidence of the need for an order of permanent custody to [CCDCFS]" and contends that "the record reflects that the [s]tate presented evidence to a lesser standard — a preponderance of the evidence standard."

### Determination that L.S. Could Not Be Placed with Mother within a Reasonable Time or Should Not Be Placed with Mother

{¶ 46} Under R.C. 2151.353(A)(4), the juvenile court was first required to determine whether L.S. could not be placed with Mother within a reasonable time or should not be placed with Mother in accordance with R.C. 2151.414(E). In determining whether a child cannot be placed with a parent within a reasonable time or should not be placed with a parent, the juvenile court must consider "all relevant evidence." R.C. 2151.414(E). R.C. 2151.414(E) lists specific factors for the juvenile court to consider in making this determination. If the juvenile court finds by clear and convincing evidence that at least one of the enumerated factors in R.C. 2151.414(E) exists as to each of the child's parents, the juvenile court must find that the child cannot be placed with either parent within a reasonable time or should not be placed with the child's parents. *Id.*

{¶ 47} In this case, the juvenile court found that R.C. 2151.414(E)(13) — the parent is repeatedly incarcerated, and the repeated incarceration prevents the parent from providing care for the child — and (16) — any other factor the court considers relevant, i.e., a "significant parent/child conflict" — applied to Mother. Although we note that the juvenile court did not specifically indicate, in its journal entry, that its findings were supported by "clear and convincing evidence," this court has held that inclusion of such language is not a requirement for permanent custody. *See, e.g., In re B.M.*, 8th Dist. Cuyahoga No. 96214, 2011-Ohio-5176, ¶ 24-25; *In re T.S.*, 8th Dist. Cuyahoga No. 92816, 2009-Ohio-5496, ¶ 36; *see also In re Lawson/Reid Children*, 2d Dist. Clark No. 96-CA-0010, 1997 Ohio App. LEXIS 1530, 9-10 (Apr. 18, 1997) ("In light of the 'clear and convincing evidence' standard's longstanding commanding place in [permanent custody] hearings such as this, we will not presume that the court applied a different standard simply because it did not expressly state the standard it was applying.").

{¶ 48} With respect to the juvenile court's finding that R.C. 2151.414(E)(13) applies, i.e., that "the parent is repeatedly incarcerated, and the repeated incarceration prevents the parent from providing care for the child," we note that although the record shows that Mother had been previously incarcerated and unable to care for L.S., there is nothing in the record that shows that this was the case at the time of the hearing. It appears from the record that Mother was last incarcerated in 2017 or 2018. L.S. was placed in Mother's custody in November 2019. It was because Mother had allegedly placed L.S. with an inappropriate caregiver, had a

drug relapse and could not be found that L.S. was placed in agency custody again in February 2020. Accordingly, we question whether Mother's prior incarceration could properly support termination of her parental rights now. However, Mother does not challenge the juvenile court's findings under R.C. 2151.414(E)(13) or (16) or its determination that L.S. could not be placed with Mother within a reasonable time or should not be placed with Mother in her appellate brief. She challenges only the juvenile court's determination that granting permanent custody of L.S. to CCDCFS was in her best interest. Accordingly, we do not address that further issue here.

**Best Interest of the Child**

{¶ 49} The best-interest determination, focuses on the child, not the parent. *In re N.B.*, 2015-Ohio-314, at ¶ 59. In determining whether permanent custody is in the best interest of the child under R.C. 2151.414(D)(1), the juvenile court must consider "all relevant factors," including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division

(D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in [R.C. 2151.414 (E)(7) to (11)] apply in relation to the parents and child.[6]

R.C. 2151.414(D)(1).

{¶ 50} The juvenile court is required to consider each factor listed in R.C. 2151.414(D)(1); however, no one factor is to be given greater weight than the others. *In re T.H.*, 8th Dist. Cuyahoga No. 100852, 2014-Ohio-2985, ¶ 23, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. Further, only one of the factors set forth in R.C. 2151.414(D)(1) need be resolved in favor of permanent custody to support a finding that permanent custody is in a child's best interest and to terminate parental rights. *In re J.C-A.*, 2020-Ohio-5336, ¶ 80; *In re A.B.*, 8th Dist. Cuyahoga No. 99836, 2013-Ohio-3818, ¶ 17; *In re N.B.* at ¶ 53.

{¶ 51} The juvenile court has considerable discretion in weighing the R.C. 2151.414(D)(1) factors. We review a juvenile court's determination of a child's best interest for abuse of that discretion. *In re D.A.*, 8th Dist. Cuyahoga No. 95188, 2010-Ohio-5618, ¶ 47; *see also In re J.B.*, 2013-Ohio-1704, at ¶ 97 ("[T]he discretion that a trial court has in custody matters should be accorded the utmost respect, given the

---

[6] These factors include: whether the parent has been convicted of certain crimes, has withheld medical treatment or food from the child, has placed the child a substantial risk due to the parent's drug or alcohol use and rejected treatment, has abandoned the child or had had its parental rights terminated with respect to a sibling of the child. R.C. 2151.414(E)(7)-(11).

nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned."). A trial court abuses its discretion where its decision is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 52} As detailed above, in its September 2, 2020 journal entry granting permanent custody of L.S. to CCDCFS, the juvenile court identified each of the relevant factors it considered under R.C. 2151.414(D)(1) in determining that an award of permanent custody to the agency was in the best interest of L.S. and set forth specific factual findings explaining its evaluation of each these factors.

{¶ 53} Following a careful review of the record, we question the evidentiary basis for the juvenile court's finding that L.S. was "bonded" with her foster mother. At the time of the hearing, L.S. had been in that foster placement for less one month. Although Williams testified that L.S. had said she feels "comfortable" in her current placement and that the foster mother is "very down to earth," "listens to her" and "is open to understanding her," it is hard to believe that L.S. would have already "bonded" with her new foster mother in less than a month's time, particularly given L.S.'s long history of being in and out of foster homes.

{¶ 54} Nevertheless, as stated above, only one of the factors set forth in R.C. 2151.414(D)(1) needs to be resolved in favor of permanent custody to support a determination that permanent custody is in a child's best interest. Accordingly, even if the juvenile court's finding that L.S. was bonded with her foster mother is not supported by clear and convincing evidence, it would not preclude the juvenile court

from granting permanent custody to the agency if the juvenile court's other "best interest" findings favoring permanent custody were supported by clear and convincing evidence.

{¶ 55} Following careful consideration of the testimony presented at the permanent custody hearing, we find that competent, credible, clear and convincing evidence supports the juvenile court's remaining findings, including that (1) L.S. does not have a bond with Mother, (2) L.S. does not wish to return home to Mother, (3) there is a lengthy custodial history based on the prior case, (4) L.S. "deserves a safe and stable environment where her needs are met" and (5) there are no other relatives with whom L.S. could be placed.

{¶ 56} Mother asserts that she is L.S.'s only "hope for permanent placement." She contends that the agency did not show by clear and convincing evidence that L.S.'s stated disinterest in reunification should be given substantial weight in what was in her best interest given: (1) L.S.'s past inability to articulate her justification for not wanting to live with Mother; (2) L.S.'s "disinterest in all placement," (3) her "repeated failure in every single foster home in which she was placed" and (4) the agency's "concession" that L.S.'s "chance" for permanent placement in a foster home was "low."

{¶ 57} She argues that this case is similar to *In re D.F.,* 8th Dist. Cuyahoga No. 108055, 2019-Ohio-3046, in which this court reversed a juvenile court's order granting permanent custody of seven of a mother's nine children to CCDCFS, concluding that the record lacked clear and convincing evidence that it was in the

best interest of the children to terminate Mother's parental rights and grant permanent custody of the children to CCDCFS. *Id.* at ¶ 35, 56. Mother asserts that in this case, as in *In re D.F.*, "all the work was done by [M]other" and that, therefore, "[t]he family should be together." This case, however, is readily distinguishable from *In re D.F.*

{¶ 58} In *In re D.F.*, not only had the mother completed the programming required of her, secured suitable housing that would accommodate herself and her nine children and "done all the work to have her children returned to her," all of the children had regular contact with the mother, all of the children had a strong and loving relationship with the mother and their siblings and all of the children had expressed a strong, consistent desire to be reunited with their mother. *Id.* at ¶ 38-39, 54-55. Unfortunately, this is not that case.

{¶ 59} This is a difficult case. There is no dispute that, for the most part, as of the date of the hearing, Mother was doing what the agency had asked her to do. Mother had obtained stable housing, was receiving mental health services, was attending parenting classes, had completed drug treatment, had complied with random drug tests, had agreed to seek further treatment after a positive drug test for marijuana and was providing for L.S., sending her clothing and other necessities, even though L.S. had refused visitation with Mother. However, "substantial compliance with a case plan" is not, in and of itself, "dispositive" and "does not preclude a grant of permanent custody to a social services agency." *In re J.B.*, 2013-Ohio-1704, at ¶ 90, citing *In re C.C.*, 187 Ohio App.3d 365, 2010-Ohio-780, 932

N.E.2d 360, ¶ 25 (8th Dist.). This case is not about Mother's compliance or lack of compliance with the case plan.

{¶ 60} Mother has shown great initiative in doing what needs to be done, getting herself enrolled in necessary drug treatment and parenting classes, rather than waiting for agency referrals. She has made great strides since she was released from prison in 2017 or 2018. Mother also appears to have genuine affection for L.S. It is, however, not the impact on Mother but the impact on L.S. that must be considered in determining whether an award of permanent custody is in L.S.'s best interest.

{¶ 61} Despite Mother's efforts, the fact remains Mother has no real bond or relationship with L.S. For most of L.S.'s life, Mother was in and out of prison. Including the three months she lived with Mother from November 2019-February 2020, 12-year-old L.S. has spent less than two years total — sporadically — in her Mother's care.

{¶ 62} L.S. has refused to participate in family counseling and has consistently indicated that she has no desire to live with Mother, even preferring to remain in foster care or a group home rather than be returned to Mother's care. When L.S. was returned to Mother's care in November 2019, she had to be "tricked" into going home with Mother. Three months after L.S. returned home, just as things started to settle down, Mother, once again, left her. Relapsing on cocaine, Mother left L.S. with her girlfriend/roommate — who later died of a drug overdose in the presence of L.S. Mother was not in communication with L.S., the

girlfriend/roommate or the agency after she left, and her whereabouts were unknown for almost two weeks.

{¶ 63} Although since she was removed from Mother's care in February 2020 L.S. has participated in calls and Facetime with Mother (facilitated by Williams) and has thanked Mother for the clothing and other items Mother has provided for her, L.S. has refused any visitation with her. This is perhaps understandable given what happened during her prior "visitation" with Mother (when she was "tricked" into returning home with Mother) and the trauma she experienced when she was last returned to Mother. Based on the record before us, it appears that L.S. has simply lost all trust in Mother and her ability to serve as an appropriate caregiver and has no desire to reunify with Mother. There is nothing in the record to suggest that Mother's completion of any additional services would resolve the conflict between Mother and L.S. and their strained relationship, leaving permanent custody as the only option.

{¶ 64} Every termination-of-parental-rights case involves the difficult balance between maintaining a natural parent-child relationship and protecting the best interest of a child. However, the "paramount consideration" is always the best interest of the child. *In re J.B.*, 2013-Ohio-1704, at ¶ 111. On the record before us, we cannot say that the juvenile court abused its discretion in determining that an award of permanent to CCDCFS was in L.S.'s best interest. *Cf. In re S.H.*, 8th Dist. Cuyahoga No. 108404, 2019-Ohio-3575, ¶ 39-43 (clear and convincing evidence supported juvenile court's finding that permanent custody was in best interest of

child where mother and child had a "severe" "ongoing parent-teen conflict" and one of the child's half-brothers, who had been charged with raping the child, still resided in mother's home).

**{¶ 65}** Mother's assignment of error is overruled.

**{¶ 66}** Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

EILEEN A. GALLAGHER, JUDGE

SEAN C. GALLAGHER, P.J., and
MICHELLE J. SHEEHAN, J., CONCUR