[Cite as *In re V.G.*, 2022-Ohio-191.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

IN RE V.G.

A Minor Child

[Appeal by M.G., Father]

:

:

:

:

No. 110609

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** January 27, 2022

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD-19908212

---

## *Appearances:*

Prugh Law, LLC, and Leigh S. Prugh, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee.*

EMANUELLA D. GROVES, J.:

{¶ 1} Appellant-father ("Father")[1] appeals from the judgment of the Cuyahoga County Common Pleas Court, Juvenile Division, granting permanent custody of his minor child, V.G., to appellee, the Cuyahoga County Department of

---

[1] The child's mother, C.C. ("Mother"), is not a party to this appeal but will be referenced throughout this opinion to provide context.

Children and Family Services ("CCDCFS" or "the agency").  For the reasons that follow, we affirm.

## Procedural and Factual History

{¶ 2} On July 3, 2019, CCDCFS filed a complaint alleging that V.G., born June 14, 2019, was an abused and dependent child as defined by R.C. 2151.031(D) and 2151.04(B). In support of its complaint, the agency alleged the following particulars:

1. On or about May 2, 2019, mother tested positive for benzodiazepine, morphine, amphetamines and cocaine while pregnant with child.  The child tested positive for cocaine at the time of birth and has remained hospitalized due to experiencing withdrawal symptoms.

2. Mother has a chronic substance use disorder.  She has been using for nearly twenty years and has not been able to maintain sobriety despite having completed substance abuse treatment in the past.

3. Mother has mental health issues that prevent her from providing a safe home for the child.  Mother has multiple mental health diagnoses but is not consistently receiving mental health services.  Mother displays symptoms of paranoia and confusion.

4. Mother has not been visiting the child consistently since the child's birth and has not been able to learn how to properly address the special needs of the child due to her lack of visitation.

5. Mother does not have safe housing in which to provide for the child. Mother's housing is deplorable.

6. [B.B.] and mother are married.  However, [B.B.] is not the biological father of the child.

7. Alleged biological father, [M.G.], is aware of mother's substance abuse and mental health issues but minimizes the concerns and would allow her to provide primary care for the child.

8. Alleged biological father, [M.G.], has failed to cooperate with efforts to determine his ability to provide primary care for the child.

9. Alleged father [M.G.] has not been visiting with the child consistently since the child's birth and has not been able to learn to properly address the special needs of the child due to his lack of visitation.

10. Alleged father, John Doe, [M.G.] has failed to establish paternity and has failed to support, visit, or communicate with the child since birth.

{¶ 3} Along with the complaint, CCDCFS also filed a motion for pre-dispositional temporary custody of V.G. to the agency. After conducting a hearing, that same day, the juvenile court granted the motion and V.G. was placed in the pre-dispositional temporary custody of CCDCFS. On September 17, 2019, both Mother and Father along with their respective counsel executed a waiver of the 90-day statutory time requirement for dispositional custody.

{¶ 4} On October 15, 2019, the juvenile court held an adjudicatory hearing, found V.G. to be abused and neglected, and continued the matter for a disposition. At the hearing on November 19, 2019, Mother and Father, through their respective counsel, agreed to the request for temporary custody to the agency. Subsequently, the juvenile court issued an entry placing V.G. in the temporary custody of CCDCFS.

{¶ 5} The agency developed a case plan that included substance-abuse and mental-health treatment, as well as parenting classes for Mother. The case plan also included a parenting component for Father to address his minimization of Mother's substance-abuse and mental-health issues. In addition, as part of the Sobriety Treatment and Recovery Team ("START") program, the agency requested random drug screening for Father.

{¶ 6} Later, the agency amended Father's case plan to include a housing element, based on its concerns, detailed as follows in the filing:

> Father does not have stable/independent housing. Father resides in the home with Mother that currently has severe mental health. Father often is in fear of Mother cutting him off and kicking him out. Father goes back and forth on whether they reside together. Father showed an unfurnished unit beneath Mother's with no working utilities as a residence. Father later admitted that he resided in the upstairs with [Mother].

{¶ 7} On June 26, 2020, CCDCFS filed a motion to modify temporary custody to permanent custody. In support of the motion, the agency submitted the affidavit of Amber Hunter ("Hunter"), who averred, in pertinent part:

> 5. A case plan was filed with Juvenile Court and approved which required that mother complete substance abuse treatment and mental health counseling.
>
> 6. Mother has failed to engage in substance abuse or mental health services. Mother tested positive for amphetamines in November 2019 and has not submitted a drug screen since then.
>
> 7. During the visits with the child, Mother displayed a lack of parenting skills and erratic behavior.
>
> 8. The case plan required that Father complete parenting education.
>
> 9. Father has failed to complete parenting education. Additionally, Father lacks appropriate housing in which to provide for the child.

{¶ 8} In response, Father filed two separate motions wherein he requested that either V.G. be placed in his custody or that the order of temporary custody be extended. On November 16, 2020, Father filed a motion to extend parenting time, which the juvenile court denied following a hearing. On June 3, 2021, the juvenile court held a dispositional hearing.

**Dispositional Hearing**

{¶ 9} At the hearing, CCDCFS presented the testimony of START team worker Myrtis Rander-Walker ("Rander-Walker"), who testified that she inherited the case after V.G. had been placed in the agency's temporary custody. Rander-Walker described the circumstances that led to V.G.'s removal from Mother, including that the child tested positive for cocaine at birth and was hospitalized for 31 days with neonatal abstinence syndrome.

{¶ 10} Rander-Walker testified that by the time she became involved in the case, Mother was already noncompliant with the referred case plan services. In her first contact with V.G.'s parents, Rander-Walker asked both Mother and Father to complete a urine screen, but both failed to complete the screening. Rander-Walker continued her attempts to get Mother to engage in the referred services, but to no avail. Rander-Walker testified that Mother eventually advised her to cease contact with her and that she "wasn't allowed to come by [Mother's] home."

{¶ 11} Thereafter, the only occasions that Rander-Walker saw Mother were during the visits with V.G. Rander-Walker testified that as of the date of the hearing, Mother had not complied with any of the referred services that were geared to effect reunification. Mother had no documentary evidence that she engaged in either substance-abuse or mental-health treatment. Rander-Walker testified that throughout the pendency of the matter, Mother was resistant to all efforts of the agency to provide assistance in resolving the underlying issues leading to V.G.'s removal.

{¶ 12} Rander-Walker testified regarding the scope of Father's case plan, emphasizing the need for appropriate housing. Relying on the previous case worker's notes, Rander-Walker, who had not been allowed to inspect the house where V.G.'s parents were living, indicated that it was a two-family house and that the parents occupied the upstairs, but had free rein of the downstairs unit. Rander-Walker testified that she discussed the need for appropriate independent housing with Father, who indicated that he would secure separate housing.

{¶ 13} Rander-Walker added she discussed the subject with Father at least once each month and, at one point, Father indicated that he had secured housing and provided an address for inspection. Instead, it was a false lead and not a valid address. Rander-Walker testified that upon confronting Father, he admitted that it was a "bad address," apologized, and stated that he was "just trying to give [Rander-Walker] something," but again insisted that he was moving.

{¶ 14} Rander-Walker testified that in January or February 2021, Father provided another address, indicated he was moving into the property, and said that he would be sending a copy of the lease. When Rander-Walker visited the address, she discovered it was a house under construction or renovation. Rander-Walker confronted Father at a scheduled visit with V.G., and Father insisted he had a lease for the property and that he would be sending it momentarily via text. Rander-Walker testified that upon receiving the text, the message was empty. Eventually, Father, while not admitting it was not a valid address, claimed that he was unable to secure that property due to his poor credit history.

{¶ 15} Rander-Walker testified that throughout the life of the case, Father consistently claimed that he was going to acquire separate housing, as well as maintained that he did not need housing referrals from the agency because he had his own resources through family contacts and his employment. Rander-Walker testified that although she explained to Father that the agency could not place V.G. in a home Father shared with Mother, who had unresolved substance-abuse and mental-health issues, Father continued to live with Mother throughout the life of the case.

{¶ 16} Rander-Walker testified that in addition to housing, the agency had concerns about substance abuse. Although substance-abuse services were not initially on Father's case plan because the agency had no concrete knowledge of any drug use, Rander-Walker testified that in cases where substance abuse is involved, it is customary for the agency to test both parents. Rander-Walker testified that Father was asked to submit to a drug screen each time Mother was asked, but failed to comply until May 2021, the month prior to trial. At that time, Father completed both a urine screen, which detects immediate use, and a hair-follicle test, which indicates more chronic use. Rander-Walker testified that Father's hair-follicle test was positive for cocaine, which indicated that he had used cocaine on more than three occasions within the past six months.

{¶ 17} Rander-Walker testified that V.G. had been placed in foster care and had remained in the same placement since she was released from the hospital. V.G. resided with her foster parents and their two biological sons, ages five and seven.

Rander-Walker testified that V.G. was well-bonded with the foster family and that the foster mother, a certified nurse practitioner who was pursuing a doctoral degree, was uniquely suited to attend to the child's special needs.

{¶ 18} Rander-Walker elaborated on V.G.'s special needs and noted that the child was engaged in both physical and occupational therapies because of her many serious conditions. Rander-Walker stated that V.G. was under the care of a neurologist, whom she was seeing every four to six weeks, because of a condition called germinal matrix hemorrhage. V.G. was also under the care of a neonatologist, whom she saw every four to six weeks. Additionally, Rander-Walker stated that V.G. had a tumor that was sitting on her trachea, for which she had received twelve-months of treatment and was now engaged in speech therapy. Further, Rander-Walker stated that V.G. was developmentally delayed and that therapy had been recommended.

{¶ 19} Finally, Rander-Walker testified that the agency had expended significant efforts in trying to identify relatives who might be willing to appropriately care for V.G., but none of those efforts proved fruitful. Rander-Walker noted that the interaction between V.G. and her parents during the scheduled visits were always positive, due largely to V.G.'s outgoing personality. However, Rander-Walker opined that the agency's motion for permanent custody of V.G. should be granted.

{¶ 20} V.G.'s guardian ad litem, Victor Chukwudelunzu (the "GAL"), who previously filed a written report recommending that permanent custody be granted

to the agency, indicated that his sentiments favoring a grant of permanent custody to the agency had not changed. Following the GAL's oral recommendation, the respective counsel, all of whom were in possession of the GAL's report, declined the opportunity the juvenile court afforded them to cross-examine the GAL.

{¶ 21} On June 15, 2021, the juvenile court journalized an entry terminating all parental rights and granting permanent custody to the agency.

{¶ 22} Father now appeals and raises the following sole assignment of error for our review:[2]

## Assignment of Error

The juvenile court erred in granting permanent custody of V.G. to the Cuyahoga County Division of Children and Family Services because its findings are against the manifest weight of the evidence.

## Law and Analysis

{¶ 23} In his sole assignment of error, Father argues the juvenile court erred in granting permanent custody to the agency because the decision is not supported by clear and convincing evidence.

---

[2] Father originally raised two assignments of error but, at oral argument in this matter, withdrew the first assignment of error, which stated: "[t]he juvenile court committed plain error in not dismissing this action after it did not hold the dispositional hearing within the time period required by R.C. 2151.35(B)(1)." The record indicates that on September 17, 2019, both Mother and Father, along with their respective counsel, executed a waiver of the 90-day statutory time requirement. Thus, Father's decision to withdraw the first assignment of error is well-taken.

**{¶ 24}** At the outset, we note that, it is well established that a parent has a fundamental right to raise and care for his or her child. *In re L.M.*, 8th Dist. Cuyahoga No. 106072, 2018-Ohio-963, citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 28; *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 40. We recognize that termination of parental rights is "the family law equivalent of the death penalty in a criminal case." *In re V.C.*, 8th Dist. Cuyahoga Nos. 102903, 103061, and 103367, 2015-Ohio-4991, citing *In re J.B.*, 8th Dist. Cuyahoga No. 98546, 2013-Ohio-1704, ¶ 66, quoting *In re Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, ¶ 14.

**{¶ 25}** An appellate court will not reverse a juvenile court's decision awarding permanent custody to an agency if the judgment is supported by clear and convincing evidence. *In re J.M-R.*, 8th Dist. Cuyahoga No. 98902, 2013-Ohio-1560, ¶ 28. "Clear and convincing evidence" is that measure or degree of proof that is more than a "preponderance of the evidence," but does not rise to the level of certainty required by the "beyond a reasonable doubt" standard in criminal cases. *In re K.S.*, 8th Dist. Cuyahoga No. 109928, 2021-Ohio-694, ¶ 15, citing *In re M.S.*, 8th Dist. Cuyahoga Nos. 101693 and 101694, 2015-Ohio-1028, ¶ 8, citing *In re Awkal*, 95 Ohio App.3d 309, 315, 642 N.E.2d 424 (8th Dist.1994), citing *Lansdowne v. Beacon Journal Publishing Co.*, 32 Ohio St.3d 176, 180-181, 512 N.E.2d 979 (1987). It "produces in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *In re K.S.* at ¶ 15, citing *In re M.S.* at ¶ 18.

{¶ 26} The termination of parental rights is governed by R.C. 2151.414. *In re M.H.*, 8th Dist. Cuyahoga No. 80620, 2002-Ohio-2968, ¶ 22. R.C. 2151.414 sets forth a two-part test courts must apply when deciding whether to award permanent custody to a public services agency.

### First Prong:  R.C. 2151.414(B)(1)(a)-(e)

{¶ 27} Under the first prong, the juvenile court must find by clear and convincing evidence one of the following five factors:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

> (b) The child is abandoned.

> (c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

> (e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated

an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

R.C. 2151.414(B)(1)(a)-(e).

{¶ 28} Only one of the factors must be present for the first prong of the permanent custody analysis to be satisfied. *In re S.S.*, 8th Dist. Cuyahoga No. 109356, 2020-Ohio-3039, ¶ 28, citing *In re L.W.*, 8th Dist. Cuyahoga No. 104881, 2017-Ohio-657, ¶ 28.

{¶ 29} In this matter, the juvenile court found, pursuant to R.C. 2151.414(B)(1)(a), that the child could not be placed with either parent within a reasonable time or should not be placed with either parent.

{¶ 30} In assessing whether a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents under R.C. 2151.414(B)(1)(a), a juvenile court must consider the factors outlined in R.C. 2151.414(E). *In re A.V.,* 8th Dist. Cuyahoga No. 101391, 2014-Ohio-5348, ¶ 58; *In re R.M.,* 8th Dist. Cuyahoga Nos. 98065 and 98066, 2012-Ohio-4290, ¶ 14; *In re B.P.,* 8th Dist. Cuyahoga Nos. 107732 and 107735, 2019-Ohio-2919, ¶ 13. A juvenile court is only required to find that one of these factors is met in order to properly find that a child cannot or should not be placed with a parent. *In re Ca.T.,* 8th Dist. Cuyahoga No. 108969, 2020-Ohio-579, ¶ 27, citing *In re V.C.,* 8th Dist. Cuyahoga Nos. 102903, 103061, and 103367, 2015-Ohio-4991, ¶ 42.

{¶ 31} Pursuant to R.C. 2151.414(E)(1), the juvenile court found that

following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the

agency to assist and remedy the problems that initially caused the child to be placed outside the home, the parents have failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home

{¶ 32} Indeed, despite Father's contentions to the contrary, the juvenile court's finding above is supported by clear and convincing evidence. Rander-Walker provided exhaustive testimony regarding the case plan developed to remedy the issues that led to V.G.'s removal and designed to effect reunification. Yet, Mother completely failed to commit to the case plan's objectives geared to addressing her mental-health and substance-abuse issues. It is undisputed that Mother failed to engage in and therefore could not benefit from the very services designed to achieve reunification with her child. As such, V.G. could not be placed with Mother within a reasonable time or should not be placed with Mother.

{¶ 33} Similarly, as an alternative to placement with Mother, the juvenile court's finding that V.G. could not be placed with Father within a reasonable time or should not be placed with Father is supported by clear and convincing evidence. Again, Rander-Walker testified extensively about Father's case plan and, in particular, the agency's concern that Father secure appropriate housing separate and apart from Mother. The testimony established that Father failed to appreciate the severity of Mother's mental-health and substance-abuse issues.

{¶ 34} Throughout the pendency of this case, the agency repeatedly emphasized to Father the importance of securing separate housing. Yet, Father made empty promises and sent the case worker on the proverbial fool's errand, by

knowingly providing invalid addresses. Significantly, because Father failed to procure separate housing from Mother over the approximately two years that the matter was pending, Father excluded himself as a viable placement alternative for V.G. In the end, the evidence established that Father was still living with Mother, who had not addressed her mental-health and substance-abuse issues.

{¶ 35} As previously stated, although a juvenile court is required to find that only one factor outlined in R.C. 2151.414(E) is met in order to properly find that a child cannot or should not be placed with a parent, the juvenile court, in this matter, made additional findings, pursuant to R.C. 2151.414(E)(2), (4), and (16). The findings are as follows:

> (2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the mother that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;

> (4) The parents have demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

> (16) Any other factor the Court considers relevant.

{¶ 36} Specifically, under subsection (16), the juvenile court listed a plethora of factors it considered, namely:

> The child was born drug exposed and has been with the same foster family since going home from the hospital after birth. The parents have not complied with the case plan services. The mother has substance abuse problems, mental health problems, and was supposed to take parenting class. She has failed to address these issues, and the agency

has no sobriety date for the mother, and she has refused to sign any release information. The father was told repeatedly that he needed to establish housing that was independent from mother because of her substance abuse issues. He has not done this over the course of the case. Instead, he actively misled the social worker on his housing situation. The social worker repeatedly asked the father to provide a urine screen to establish that he was a safe and sober caregiver. He never provided such a screen. In May of 2021, the father's hair sample was positive for cocaine. Based on the totality of these facts, this Court shares the concerns of the GAL for the child and CCDCFS that these parents, who live together, cannot provide a safe and sober home for this child. This child has been in the agency custody for nearly two years. There is no evidence or cause to believe that this situation will change within the foreseeable future.

{¶ 37} Here, it is clear that neither parent chose to address the issues that led to V.G.'s removal. Importantly, Father made no strides toward the objective that went to the very heart of the case plan — securing independent housing from Mother, who failed to address her mental-health and substance-abuse issues. As such, there is no dispute that V.G. cannot be placed with either parent within a reasonable time.

{¶ 38} Our review of the record reveals that the juvenile court's findings under the first prong are supported by competent and credible evidence. Finding no error with the juvenile court's findings under the first prong, we consider the court's finding under the second prong.

## Second Prong: R.C. 2151.414(D)

{¶ 39} The second prong requires the juvenile court to find by clear and convincing evidence that granting permanent custody to the agency is in the best interest of the child. We review a trial court's best-interest determination under R.C.

2151.414(D) for an abuse of discretion. *In re D.A.*, 8th Dist. Cuyahoga No. 95188, 2010-Ohio-5618, ¶ 47. In this regard, "'[a] trial court's failure to base its decision on a consideration of the best interests of the child constitutes an abuse of discretion.'" *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 60, quoting *In re T.W.*, 8th Dist. Cuyahoga No. 85845, 2005-Ohio-5446, ¶ 27, citing *In re Adoption of Ridenour*, 61 Ohio St.3d 319, 574 N.E.2d 1055 (1991).

{¶ 40} R.C. 2151.414(D)(1) sets forth best-interest factors that the court must consider when making the best-interest determination under R.C. 2151.414(D)(1), including

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child * * *;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 41} The juvenile court has considerable discretion in weighing these factors. *In re D.A.* at ¶ 47. Although a trial court is required to consider each relevant factor under R.C. 2151.414(D)(1) in making a determination regarding permanent custody, "there is not one element that is given greater weight than the others

pursuant to the statute." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. Moreover, "[R.C. 2151.414(D)(1)] requires a weighing of all the relevant factors * * * [and] requires the court to find the best option for the child * * *." *Id.* at ¶ 64.

{¶ 42} Further, the Ohio Supreme Court, in *In re A.M.*, Slip Opinion No. 2020-Ohio-5102, held that R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best-interest factors in R.C. 2151.414(D)(1)(a) through (e). *Id.* at ¶ 31. Consideration is all the statute requires. Although a reviewing court must be able to discern from the magistrate's or juvenile court's decision, and the court's judgment entry, that the court satisfied the statutory requirement that it consider the enumerated factors, we may not graft onto the statute a requirement that the court include in its decision a written discussion of or express findings regarding each of the best-interest factors. *Id.*

{¶ 43} We begin our inquiry into the second prong by noting the juvenile court articulated that it considered the relevant factors set forth under R.C. 2151.414(D)(1) when assessing the child's best interests. Based on this record, we do not find that the juvenile court abused its discretion in determining that permanent custody was in the child's best interests.

{¶ 44} Specifically, the juvenile court found that "the custodial history and the need for a legally secure placement weigh[ed] in favor of permanent custody in determining the child's best interests" and illuminated as follows:

The child has had extensive special needs over her two years of life. She has needed occupational therapy, physical therapy, and speech therapy. She has had twelve months of beta-blocker treatments to treat a Hemangioma on her neck. The Court notes the GAL report, * * * provides a detailed excellent summary of the child's medical history and treatment needs. Based upon all of these issues, the GAL for the child has recommended that permanent custody is in her best interest as she is entitled to permanency. This Court agrees and finds that the child is entitled to permanency. *See In re C.B.*, 129 Ohio St.3d 231, 2011-Ohio-2899 (McGee Brown, J., concurring opinion).

{¶ 45} Undeniably, the record supports the juvenile court's best-interest findings encapsulated above. The GAL written report indicated that V.G. was thriving in her foster home, noted that the foster mother was in the medical profession, while the foster father was an analyst and pointed out that both parents have flexible work schedules that allow them to adequately care for V.G.'s special needs.

{¶ 46} Our review reflects that the best-interest factors that the juvenile court must consider under the second prong was contained in the record. As such, we conclude that the juvenile court's termination of parental rights and award of permanent custody of V.G. to CCDCFS is supported by clear and convincing evidence.

{¶ 47} Accordingly, we overrule the sole assignment of error.

{¶ 48} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EMANUELLA D. GROVES, JUDGE

ANITA LASTER MAYS, P.J., and
KATHLEEN ANN KEOUGH, J., CONCUR