[Cite as *In re C.H.*, 2024-Ohio-75.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE C.H.                                          :
                                                    :          No. 113023
A Minor Child                                       :
                                                    :
[Appeal by L.H., Mother]                            :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** January 11, 2024

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD23903514

---

### *Appearances:*

Marc L. Stolarsky Law, LLC, and Marc L. Stolarsky, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Zachary J. LaFleur, Assistant Prosecuting Attorney, *for appellee*.

---

FRANK DANIEL CELEBREZZE, III, P.J.:

{¶ 1} Appellant L.H. ("Mother") appeals the decision of the Cuyahoga County Juvenile Court terminating her parental rights and awarding custody of her minor child, C.H. (d.o.b. 08/04/2017), to the Cuyahoga County Division of Children and Family Services ("CCDCFS" or "agency"). After a thorough review of the law and applicable facts, we affirm the judgment of the juvenile court.

## I. Factual and Procedural History

{¶ 2} CCDCFS first became involved in this matter when the facility where C.H. resides, Sunshine Communities ("Sunshine" or "facility"), contacted the agency after being unable to get in contact with Mother for the completion of certain necessary paperwork. C.H. has resided at Sunshine for almost five years, beginning after he left the hospital following his birth. C.H. is permanently on a ventilator and tracheostomy tube due to chronic respiratory failure and has a feeding tube. He is nonverbal and has developmental issues.

{¶ 3} In March 2023, CCDCFS filed a complaint alleging that C.H. was neglected and dependent and requested a disposition of permanent custody. The juvenile court held an adjudicatory hearing after which C.H. was determined to be neglected and dependent. Mother did not appear at this hearing.[1]

{¶ 4} A dispositional hearing was held in June 2023, where Mother again did not appear. The agency presented the testimony of Ronald Parks ("Parks"), a short-term caseworker assigned to the family; Jennifer Menningen ("Menningen"), a social worker with Sunshine; and Emily Vandergrift ("Vandergrift"), a registered nurse with Sunshine, who worked with C.H.

{¶ 5} Parks testified that when he first received the case, he explained to Mother what paperwork needed to be signed and what she needed to do to return the paperwork to the facility. He stated that Mother told him that the previous time

---

[1] Paternity was not established in this case, and thus, this appeal pertains only to Mother.

that she had not signed the paperwork, which was the year prior, the agency had completed and returned the paperwork for her.

{¶ 6} Parks testified that the agency filed a case plan in this matter that included parenting services and required Mother to maintain a relationship with C.H. and to work with Sunshine. The parenting services were necessary because Mother had failed to establish a relationship with C.H. and failed to file the necessary paperwork for the facility. Mother was referred to the Community Collaborative. Mother was cooperative with the Community Collaborative and received assistance for her other children.[2]

{¶ 7} Parks stated that his communication with Mother was "sporadic" and that it was "very hard" to get in contact with her. He had spoken with her the week before the dispositional hearing, but prior to that, there had been no contact with her for months.

{¶ 8} Parks testified that the agency was seeking permanent custody because communication with Mother had been an ongoing issue and the child needed someone who was willing to make decisions for him and sign the appropriate paperwork. He stated that there was still some paperwork that had not been signed by Mother, including one for schooling, and a medical consent form. Parks stated that he had conversations with Mother about the outstanding documents, but they still had not been signed.

---

[2] At the time of the hearings, Mother had an infant, a nine-year-old, and two teenage sons, in addition to C.H.

{¶ 9} Menningen testified next and explained her role as a social worker at Sunshine. She stated that she maintains C.H.'s benefits, including Medicaid and his supplemental security income, and has been involved with getting annual planning and school paperwork signed for C.H. She explained that every August, there is a meeting regarding C.H., after which certain paperwork must be signed. She stated that the paperwork was signed during the first two years that C.H. was at the facility, but that it was difficult to get the paperwork signed for the past two years. It is usually the same paperwork each year, but this year there was also school paperwork that had to be signed. Mother was also required to submit evidence of her residence in the form of utility bills or an affidavit from her landlord.

{¶ 10} When asked about the efforts that Sunshine made to get Mother to sign the paperwork, Menningen responded that the facility had sent the paperwork to her multiple times via certified mail. The paperwork was sent with prepaid envelopes for their return to the facility. Sunshine received the certified card back that Mother had received it, but the paperwork was not returned to the facility. She also stated that multiple staff members, including herself, had called Mother and that she had emailed Mother, all to no avail. Last summer, they involved CCDCFS to assist with getting the paperwork signed.

{¶ 11} Menningen testified that the same efforts had been made this year – the paperwork was mailed to Mother via certified mail and staff had called her multiple times. She acknowledged that they did receive some signed paperwork

once Parks was involved this year, but they still had not received the signed school paperwork.

{¶ 12} CCDCFS then presented the testimony of Vandergrift, a registered nurse who had been involved in C.H.'s care. She explained that C.H. is immobile and cannot speak but has a communication device. She described his daily care as follows:

So [C.H.] is vent dependent. He's on a ventilator 24/7. He requires trach[eostomy] care at least twice a day, suctioning throughout the day just as needed.

He has no swallowing ability so he needs oral suctioning as well.

He's tube fed 20 hours of the day. He gets medications, treatments like aerosol medications through the vent and medications through the G-tube about seven times throughout the day.

And then he gets therapy from our therapy department.

{¶ 13} Vandergrift stated that C.H.'s care plan was formed after going over his needs and progress each year. She was not aware of Mother ever being involved in these annual meetings. She stated that Mother had not attended the child's medical appointments and when he had been hospitalized, they usually had to leave messages and wait for her to call them back. She testified that the only interaction she has had with Mother was in 2020 when Mother called to FaceTime with C.H. while Vandergrift was in his room.

{¶ 14} When asked what value she saw in doing virtual visits such as the FaceTime call, Vandergrift stated that Mother "just kinda had the phone open" and

"wasn't necessarily FaceTiming with him the whole time." She said different people were getting on and off the call, and sometimes there was no one on the other end.

{¶ 15} Vandergrift testified that C.H. is able to recognize people that he sees daily but that he probably would not recognize Mother since he had not seen her face-to-face in five years.

{¶ 16} Regarding the importance of the unsigned paperwork, Vandergrift testified that the facility needed to get C.H. into school and that there is a public school with a "medically fragile unit" that he could attend. He would need an IEP for the school, which also required Mother to sign papers. Further, if C.H. were to need hospitalization,[3] the hospital might need emergency consent, and it would be a problem if they were unable to reach Mother.

{¶ 17} Vandergrift stated that she believed that Mother does not fully understand the depth of C.H.'s needs and the amount of care required each day. When Mother does call the facility, she asks how C.H. is doing but does not have specific questions about his health.

{¶ 18} On cross-examination, Vandergrift acknowledged that she does not work with C.H. on a daily basis and had not observed him for the past year to know if there had been any more FaceTime visits with Mother. She further conceded that Sunshine is located approximately two hours from the Cleveland area.

---

[3] Vandergrift testified that C.H. had been hospitalized only twice within the last three years, but when he first came to Sunshine, he had been taken to the hospital more frequently.

**{¶ 19}** Vandergrift was asked about the visitation restrictions during the COVID-19 pandemic. She said in late 2020, they began scheduled family visits outside of the medically fragile unit, which involved the visitors being screened prior to their visit. She testified that there were no restrictions (outside of the screening) for visits during the winters of 2020-2021 and 2021-2022.

**{¶ 20}** Finally, Vandergrift stated that the clothes that C.H. is dressed in each morning were provided by Sunshine; to her knowledge, Mother had not provided any clothing.

**{¶ 21}** The child's guardian ad litem had provided a written report to the court and gave her final recommendation at the hearing. She noted that she had not met Mother and that it had been very difficult to reach her. She emphasized the need for the facility to be able to reach Mother in an emergency and recommended that the court grant permanent custody of the child to CCDCFS.

**{¶ 22}** Following the hearing, the court granted the motion for permanent custody to CCDCFS and terminated Mother's parental rights. The trial court made the following findings:

> The Court finds that following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed to continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. Paternity is not established.
>
> The parent(s) has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the

child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.

* * *

The parent(s) has abandoned the child.

* * *

Upon considering the interaction and interrelationship of the child with the child's parents, siblings; the special needs of the child; the custodial history of the child, including whether the child has been in temporary custody of a public children services agency or private child placing agency under one or more separate orders of disposition for twelve or more months of a consecutive twenty-two month period; the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody; and the report of the Guardian ad Litem; the Court finds by clear and convincing evidence that a grant of permanent custody is **in the best interests of the child** and the child cannot be placed with one of the child's parents within a reasonable time and should not be placed with either parent.

* * *

The Court finds that the child's continued residence in or return to the home of mother, [L.H.], will be contrary to the child's best interest.

* * *

(Emphasis sic.)

{¶ 23} Mother then filed the instant appeal, raising one assignment of error

for our review:

The court's decision was an abuse of discretion and against the manifest weight of the evidence because the trial court erred in determining that mother failed to support, visit, and communicate with the child during the worldwide COVID pandemic.

## II. Law and Analysis

{¶ 24} The right to raise one's own child is "'an essential and basic civil right.'" *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 67, quoting *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997); *see also In re Murray*, 52 Ohio St.3d 155, 156, 556 N.E.2d 1169 (1990), quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (a parent has a "'fundamental liberty interest' in the care, custody, and management" of his or her child). However, this right is not absolute. It is "'always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re L.D.*, 2017-Ohio-1037, 86 N.E.3d 1012, at ¶ 29, quoting *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979).

{¶ 25} Because termination of parental rights is "'the family law equivalent of the death penalty in a criminal case,'" *In re J.B.*, 8th Dist. Cuyahoga No. 98546, 2013-Ohio-1704, ¶ 66, quoting *In re Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, ¶ 14, it is "an alternative of last resort." *In re Gill*, 8th Dist. Cuyahoga No. 79640, 2002-Ohio-3242, ¶ 21. It is, however, "sanctioned when necessary for the welfare of a child." *In re M.S.*, 8th Dist. Cuyahoga Nos. 101693 and 101694, 2015-Ohio-1028, ¶ 7, citing *In re Wise*, 96 Ohio App.3d 619, 624, 645 N.E.2d 812 (9th Dist.1994). "'All children have the right, if possible, to parenting from either natural or adoptive parents which provides support, care, discipline, protection and motivation.'" *In re J.B.* at ¶ 66, quoting *In re Hitchcock*, 120 Ohio App.3d 88, 102, 696 N.E.2d 1090 (8th Dist.1996).

{¶ 26} In her sole assignment of error, Mother argues that the trial court's decision to grant permanent custody of C.H. to the agency was an abuse of discretion and against the manifest weight of the evidence. Specifically, Mother asserts that the trial court erred in finding that she had abandoned C.H.

{¶ 27} While Mother argues in part that the juvenile court's decision constituted an abuse of discretion, the Supreme Court of Ohio has recently held that this is not the appropriate standard of review.

> [T]he proper appellate standards of review to apply in cases involving a juvenile court's decision under R.C. 2151.414 to award permanent custody of a child and to terminate parental rights are the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards, as appropriate depending on the nature of the arguments presented by the parties.

*In re Z.C.,* Slip Opinion No. 2023-Ohio-4703, ¶ 18. Thus, we will disregard Mother's abuse of discretion argument and review this matter solely under the manifest-weight-of-the-evidence standard.

{¶ 28} "When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Z.C.* at ¶ 14, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20.

{¶ 29} Before a juvenile court can terminate parental rights and grant permanent custody of a child to CCDCFS, it must satisfy the two-prong test set forth

in R.C. 2151.414. First, the juvenile court must find by clear and convincing evidence that one of the following conditions set forth in R.C. 2151.414(B)(1)(a) through (e) exists:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

{¶ 30} In the instant matter, the juvenile court determined that the child had been abandoned by Mother. Under R.C. 2151.011(C), "a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with

the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days."

{¶ 31} Testimony at the hearing reflected that Mother had not visited C.H. in person since he had come to Sunshine. Mother argues that the COVID-19 pandemic impeded her ability to visit C.H. and asserts that she maintained contact with C.H. through video visits.

{¶ 32} Mother's argument that the pandemic prevented her from visiting C.H. in person lacks merit. It is undisputed that the pandemic did not begin until March 2020, and yet Mother had not visited C.H. for over two years prior to that. Moreover, while there may have been some initial restrictions on visits, Vandergrift testified that in late 2020, family members were permitted to visit after undergoing a screening. Nevertheless, Mother still did not make any attempt to visit C.H. in person. Mother places significant emphasis on her FaceTime visits, but there was no evidence presented as to the frequency of the calls — Parks characterized them as "a few" visits. Moreover, in the call that Vandergrift described, it does not sound like Mother was present throughout the virtual visit.

{¶ 33} In her brief, Mother argues that this court has previously noted that the COVID-19 pandemic affected visitation between children and parents. Mother is correct that this court has acknowledged the impact of the pandemic on visitation; however, in those cases and in the present case, the pandemic could not be blamed as the sole reason for a lack of visitation. *See In re M.H.*, 8th Dist. Cuyahoga No. 111145, 2022-Ohio-1680, ¶ 32 ("This court recognizes the [COVID]-19 pandemic

may have impacted Mother's ability to visit M.H., but in 2020 she saw M.H. only once on a FaceTime call."); *In re S.B.*, 8th Dist. Cuyahoga Nos. 110016 and 110017, 2021-Ohio-1091, ¶ 34 ("We recognize the impediments the [COVID]-19 restrictions interjected in this case. But those restrictions were not imposed until 15 months into the case."). Similarly, here, Mother has not visited the child in the entire time that he has been at Sunshine — a time period that extends far beyond the months when the pandemic would have precluded visitation.

{¶ 34} We therefore find that the trial court's determination that Mother abandoned C.H. was not against the manifest weight of the evidence.

{¶ 35} Once the first prong is met, the juvenile court must find by clear and convincing evidence that granting permanent custody to the agency is in the best interest of the child. R.C. 2151.414(B)(1). "Clear and convincing evidence" is that measure or degree of proof that "produce[s] in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus; *In re M.S.*, 8th Dist. Cuyahoga Nos. 101693 and 101694, 2015-Ohio-1028, at ¶ 8. "'Where the proof required must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof.'" *Z.C.* at ¶ 8, quoting *State v. Schiebel*, 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990), citing *Ford v. Osborne*, 45 Ohio St. 1, 12 N.E. 526 (1887), paragraph two of the syllabus.

{¶ 36} In determining the best interest of a child at a hearing held pursuant to R.C. 2151.414(A)(1), the juvenile court must consider all relevant factors, including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1).

{¶ 37} A juvenile court is required to consider each relevant factor under R.C. 2151.414(D)(1) in making a determination regarding permanent custody, but "[t]here is not one element that is given greater weight than the others pursuant to the statute." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. This court has previously stated that only one of these enumerated factors needs to be resolved in favor of the award of permanent custody. *In re Moore*, 8th Dist. Cuyahoga No. 76942, 2000 Ohio App. LEXIS 3958 (Aug. 31, 2000), citing *In re Shaeffer Children*, 85 Ohio App.3d 683, 621 N.E.2d 426 (3d Dist.1993). Further,

the Supreme Court of Ohio has clarified that "R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best-interest factors in R.C. 2151.414(D)(1)(a) through (e). Consideration is all the statute requires." *In re A.M.*, 166 Ohio St.3d 127, 2020-Ohio-5102, 184 N.E.3d 1, ¶ 31.

{¶ 38} Appellant does not specifically argue that the trial court erred in finding that permanent custody was in C.H.'s best interest but merely states that a lack of visitation is only one factor the court should consider in determining the best interest of the child. Here, the juvenile court set forth all of the factors that it considered when assessing C.H.'s best interests, and the findings made by the court were all supported by clear and convincing evidence.

{¶ 39} Mother's sole assignment of error is overruled.

### III. Conclusion

{¶ 40} After thoroughly reviewing the entire record, we find that the juvenile court's judgment was not against the manifest weight of the evidence and affirm the award of permanent custody of C.H. to CCDCFS.

{¶ 41} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
FRANK DANIEL CELEBREZZE, III, PRESIDING JUDGE

SEAN C. GALLAGHER, J., and
EILEEN T. GALLAGHER, J., CONCUR